884 F.2d 271
 Earnestine HILL, Individually, Alicia Hill, Individually,
and Earnestine Hill, as Next Friend of Christopher
Hill, a Minor, Plaintiffs-Appellants,
v.
Robert McINTYRE, Individually, John Ronan, Dennis Barton,
Larry Hottum, John Campbell, Robert Feld, Kay Lehman,
Kenneth Bluew, Gerald Raycraft, Donna Mistele, Dennis Baaki,
Gary Cassity, Robert Kurpiel, and Maxey Lumbard, Police
Officers of the City of Detroit, and City of Detroit, a
Municipal Corporation, Defendants-Appellees.
 No. 88-1708.
 United States Court of Appeals,
Sixth Circuit.
 Argued July 24, 1989.
Decided Sept. 8, 1989.
Rehearing Denied Oct. 23, 1989.
 
 Thomas B. Calcatera (argued), Bernstein & Bernstein, Southfield, Mich., for plaintiffs-appellants.
 Thomas W. Deinek and Joanne D. Stafford (argued), Detroit, Mich., for defendants-appellees.
 Before MERRITT and NELSON, Circuit Judges, and BROWN, Senior Circuit Judge.
 MERRITT, Circuit Judge.
 
 
 1
 On September 17, 1985, police officers for the City of Detroit broke into the wrong house and conducted a thorough search for drugs, detaining two minor children who lived there, one of them at gunpoint. This civil litigation arises from that search. Earnestine Hill, acting individually and as next friend of her son Christopher Hill, and Mrs. Hill's daughter Alicia Hill seek damages for a claimed violation of their constitutional rights under 42 U.S.C. Sec. 1983. The defendants are the City of Detroit, Robert McIntyre (the officer who obtained the warrant and who is sued here as an individual), and thirteen officers who conducted the search. On appeal the Hills assert that they were improperly denied the opportunity to litigate various claims under state law. They also appeal from the District Court's ruling granting all of the defendants a directed verdict on all Sec. 1983 claims at the close of the Hill's case in chief.
 
 FACTS
 
 2
 The underlying facts of this case appear to be as follows. Late in the afternoon on September 17, 1985, the Detroit Police Department obtained information that a large quantity of cocaine was stored in a certain home in Detroit from an agent of the federal Alcohol, Tobacco, and Firearms Bureau. The ATF had obtained the information from an unnamed informant in Houston who, in his turn, had obtained it from Johnnie Slaughter. Slaughter was to be the object of a "reverse sting" in Houston that night. Both Slaughter and the informant, the ATF agent informed McIntyre, were familiar with the house to be searched.
 
 
 3
 The information was, it seems, correctly relayed: the problem of identifying the correct house to search arose not because the information became distorted along this chain of narrators, but because the informant in Houston gave a visual description of the house which turned out to be ambiguous. He was unable to give a precise street address or the last name of any resident of the drug house. He told the ATF agent (1) that the drug house was located south of East Jefferson Street on Philip Street; (2) that its entry door was on the left side of the front facade; that there were (3) four windows (4) to the right of the front door; (5) that the front windows and doors were covered by grates; (6) that the house had three gray pillars; and (7) that it had no garage. He also told the ATF agent that the utility bills were in the name of a black woman named Amy. Hindsight has made it clear to all parties to this litigation that the house identified by the Houston informant was 256 Philip Street--not 258 Philip Street, the Hills' residence.
 
 
 4
 No one disputes that a mistake was made, though there is some disagreement as to how it was made. Defendant McIntyre drove to Philip Street, identified a house as the one to be searched, and sought a search warrant. Though in his pretrial deposition he stated that the house number entered on his affidavit might have been entered as 258 rather than 256 by a typographical error, he testified at trial that, after the deposition, he drove out to Philip Street with the defendants' attorney and corrected his memory. Tr. IV-389-92. At trial McIntyre testified that, when he swore out the affidavit, he had meant to identify 258 Philip Street (the Hills' residence) as the house to be searched because he believed it was the one that the informant had described. The Hills' residence has its front door to the right, four windows to the left and no window or door grates. At trial he suggested that he identified the Hills' house because he understood the drug informant to have described the house from the perspective of a person standing on the porch looking out to the street: from that point of view, the door was to the left and the windows were to the right. Tr. IV-394-95.
 
 
 5
 Aside from the wrangle over the orientation of the description, the record indicates that the Hills' residence conforms to the informant's description in that it has three gray pillars and no garage; it differs from it in that it lacks window and door grates. Trial testimony also indicated that the house at 256 Philip Street conformed to the informant's description in that it was south of East Jefferson, and several first-floor windows to the right of the front door, and had grates on the windows; it differed from the description in that it had three rather than four first-floor windows, lacked gray pillars and had a garage.
 
 
 6
 McIntyre obtained a search warrant by applying in person to a judge of the Michigan District Court. Plaintiff's Exhibit 29; JA II.18. McIntyre's affidavit, incorporated in the warrant, indicated that the ATF agent had called McIntyre from Houston on September 17, 1985 and had passed on information from the confidential agent, whom McIntyre deemed to be reliable. The affidavit recited the general scheme of the "reverse sting" planned for that night in Houston, and stated that Slaughter had told the informant that Slaughter had stashed several kilos of cocaine at "Amy's place on Philip Street" in Detroit. These are the particulars included in the affidavit about the identity of the dope house:
 
 
 7
 The address on Philip is not to the [confidential informant] [sic ] but the [confidential informant] described the Philip Street location as being south of E. Jefferson, with the entry door on the left side of the front of the dwelling, four windows to the right of the door, grates covering both the windows & doors, three grey pillars at the front of the house, with no garage on the grounds. The affiant went to Philip Street & found that the only house south of E. Jefferson on Philip bore the address of 258 Philip. Further information from [the ATF agent and the confidential informant] is that all utilities & bills to 258 Philip are in the name of a B/F known as "Amy" & that surveillance in Houston, Texas has a B/F identified as Amy in company w/Johnnie Slaughter.
 
 
 8
 The affidavit went on to say that the sting operation would take place at 10:00 p.m. Eastern Standard Time, and that the Philip Street search must take place about then too for the safety of the Houston officers.
 
 
 9
 Other officers, by the authority of this warrant, went to the Hills' home on the evening of September 17, 1985. The leader of the search team, Sergeant Ronan, testified that he knocked, announced that he came to search the house pursuant to a warrant, waited briefly for a response, and then broke open the door. He had stated in his deposition that he had heard running after his knock, but on the stand his memory on that point was shaky. Tr. V-504-506. It is undisputed that the only residents home at the time were Christopher Hill, then 11 years of age, and Alicia Hill, then 17 years of age. Alicia Hill testified that she was on her bed reading when she heard a loud noise (which she did not identify as, but which must have been, Ronan's knocking). Tr. II-126-27. Christopher Hill testified that he was asleep in his bedroom and that the officers' entry into his room woke him up. Tr. II-196. Officers told Christopher to stay in his bedroom.
 
 
 10
 Sergeant Ronan testified that, as soon as he entered the Hills' home, he sensed that it was not a place from which drugs were dealt. Tr. V-501. The search nevertheless continued. An officer commanded Alicia, at the point of a gun, to stand in the dining room. She was handcuffed. Though she was wearing only a sheer nightshirt, there was some delay before a female officer provided her with more clothing. In the meantime, officers broke open numerous packing boxes in the various rooms of the house, spilled out dry goods, poured food on the floor, and generally scared the living daylights out of the two children.
 
 
 11
 It appears clear that as soon as the officers had completed their search they became convinced that they were not in a drug house and discontinued the search. Alicia Hill testified that, after the officers had searched for some time, she told them that, if they were looking for a drug house, they wanted 256 Philip Street. Tr. II-132. Ronan testified that, as soon as he realized that he had made a mistake, he called off the search. Tr. V-511.
 
 ISSUES ON REVIEW
 
 12
 The District Judge made two separate rulings that are attacked in this appeal. First, he ruled that the complaint involved no state law claims. Second, at the close of the plaintiffs' case in chief, he granted all the defendants a directed verdict on the Sec. 1983 claims. Tr. VI-604, JA 231 (directed verdict for City of Detroit); Tr. VI-617, JA 244 (directed verdict for McIntyre); Tr. VI-628, JA 255 (directed verdict for remaining defendant officers).
 
 DIRECTED VERDICT
 
 13
 This Circuit has clearly enunciated the standard of review to be applied in an appeal from a ruling on a motion for a directed verdict pursuant to Fed.R.Civ.P. 50(a):
 
 
 14
 The standard to be applied in determining the propriety of a grant or denial of a directed verdict is whether the evidence is such, without weighing the credibility of the witnesses or considering the weight of the evidence, that there is substantial evidence from which the jury could find in favor of the party against whom the motion is made. In considering a motion for directed verdict the district court and this court must view the evidence in a light most favorable to the party against whom it is made. Only when it is clear that reasonable people could come to but one conclusion from the evidence should a court grant a motion for directed verdict.
 
 
 15
 Coffy v. Multi-County Narcotics Bureau, 600 F.2d 570, 579 (6th Cir.1979) (cites omitted). As a basic guide to federal procedural rules advises, "If there is conflicting testimony on a material issue, the court may not grant a directed verdict ... because it believes one witness and does not believe another." Wright & Miller, 9 Federal Practice and Procedure Sec. 2527, at 560 (1971).
 
 
 16
 City of Detroit. The District Court correctly ruled that the Hills' proof against the City was legally insufficient. The Hills argue that the City at least acquiesced in a Police Department custom by which officers were not trained in the proper methods for obtaining search warrants by any formal classroom training, and were not given any consistent form of testing. Rather, they claim, more experienced officers trained newer officers on-the-job, with the results that bad practices were perpetuated and that practices inconsistent with official policy were not checked. They also claim that the City illegally acquiesced in Police Department search-warrant procedures that lack a check for veracity by one officer of another officer's work.
 
 
 17
 Relying on Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the District Court held that the Hills had failed to bring any proof that the City of Detroit had an official custom or policy of failing to train or that it lacked an adequate training program. He rejected the Hills' argument that, because officers had only on-the-job training in the procedures to be followed in obtaining search warrants, they had no training, and that the City was obliged to ensure that search warrant affidavits were double-checked.
 
 
 18
 This ruling correctly reflects the record as the District Court was required to evaluate it on a motion for a directed verdict. McIntyre testified that he had received no formal classroom training in or formal testing on search-warrant procedures. Tr. IV-403-04. His uncontradicted testimony, however, was that the Police Department creates special units for obtaining search warrants, and thus does not need to provide training in this area to all officers. McIntyre's own on-the-job training involved one year of supervision by seasoned veterans at the level of sergeant and lieutenant, who took him step-by-step through the standard processes and checked every affidavit he prepared. Tr. IV-411-13. Only after this year, it appears, was he entrusted to work on his own. Ronan gave similar testimony about the training procedures for officers whose duties are to include executing drug searches. Tr. V-508, 514-15. Reviewing this uncontradicted testimony, the District Court properly concluded that the Hills had failed to show that the training program was inadequate.
 
 
 19
 There is no need to disturb this ruling because of the Supreme Court's decision in City of Canton, Ohio v. Harris, --- U.S. ----, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), issued well after the District Court's ruling in the present case. The Harris case significantly clarifies but does not alter Monell. In Harris the Supreme Court ruled that, in a failure-to-train case against a municipality, the plaintiff must meet Monell 's requirement of showing the city's own policy or custom of violating its inhabitants' civil rights by proving that the city's "failure to train amounts to deliberate indifference to the rights of persons with whom the police came into contact." Harris, 109 S.Ct. at 1204. The court established three distinct facts which the plaintiff must prove: that a training program is inadequate to the tasks that the officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is "closely related to" or "actually caused" the plaintiff's injury. Id. at 1205-06.
 
 
 20
 In our case the District Court held that the plaintiffs had failed to show that the Police Department's training program was inadequate. Further, the Hills have not shown that the Constitution requires police departments to assign a second officer to check every detail of every search warrant as a matter of policy. There being no proven inadequacy in the training or procedures associated with obtaining search warrants, the District Court properly dismissed the Hills' case against the City.
 
 
 21
 Officer Obtaining the Warrant.[1] As against McIntyre, the Hills attack the very validity of the warrant on which their house was searched. An action under Sec. 1983 does lie against an officer who obtains an invalid search warrant by making, in his affidavit, material false statements either knowingly or in reckless disregard for the truth. Donta v. Hooper, 774 F.2d 716, 718 (6th Cir.1985) (per curiam), cert. denied, 483 U.S. 1019, 107 S.Ct. 3261, 97 L.Ed.2d 760 (1987). This standard originates in Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), a suppression case in which the Supreme Court defined the Fourth Amendment's guarantee in the context of search warrants issued on the basis of false affidavits: only if "a false statement [was made] knowingly and intentionally, or with reckless disregard for the truth" and if, "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause," is there a constitutional violation under the Fourth Amendment. Id. at 155-56, 98 S.Ct. at 2676. While the Court is necessarily the factfinder in a Franks suppression hearing preliminary to a criminal trial, in a Sec. 1983 action factfinding under the Franks standard is the province of the jury. Hindman v. City of Paris, Tex., 746 F.2d 1063, 1067 (5th Cir.1984). Indeed, in a recent Sec. 1983 case our Circuit has held that the question whether the judicial officer issuing the warrant would have done so even without the knowingly or recklessly false statement is one for the jury, and we remanded the issue for trial. Yancey v. Carroll County, 876 F.2d 1238 (6th Cir.1989).
 
 
 22
 We believe that a genuine question of fact exists, proper for a jury to decide, as to whether McIntyre acted with reckless disregard for the truth. In granting McIntyre a directed verdict, the District Court made several findings of fact on uncontested elements of the record--and of course we see no difficulty with these passages of its analysis. Thus, it properly found that the house actually occupied by Amy resembled the confidential informant's description in that it had its entry door on the left, had several windows to the right of the door, and had no garage. The court properly found that the Hills' house resembled the description in that it had no garage, gray pillars, four windows to the right of a front door to the left of the front facade. Where the Court exceeded its limited authority in ruling on a directed verdict motion was when it relied on McIntyre's testimony that, when he selected the Hills' house as the one described by the confidential informant, he reasoned that the informant described the house from the perspective of a person standing on the porch looking out to the street. The Hills' attorney had vigorously impeached this claim, pointing to McIntyre's deposition testimony that he had probably put 258 Philip Street down by a mere error of transcription. An additional fact which could well have assisted the jury in assessing McIntyre's truthfulness about his care in selecting 258 Philip Street is his statement on the affidavit that "The affiant went to Philip Street & found that the only house south of E. Jefferson on Philip bore the address of 258 Philip" (emphasis added).
 
 
 23
 A reasonable juror could conclude from these circumstances not merely that McIntyre's trial testimony was false, but that he had never truthfully described the degree of care with which he sought out the house to be searched. It would be possible, furthermore, for a reasonable jury which disbelieved McIntyre's testimony to find that he had been reckless in selecting a house as the one to be searched when it had only four of seven key features included in the informant's description (location south of East Jefferson on Philip Street, four windows, gray pillars, and no garage)--particularly when the correct house exhibited almost the same number of identifying marks (location on Philip Street, entry door to the left, several--three, not four--windows to the right, and grates). It is up to a jury, not a judge, to decide whether the pillars and the lack of a garage are such salient features that they would make it less than reckless to select the house that exhibited them. Furthermore, it is up to a jury, not a judge, to evaluate McIntyre's decision not to ascertain which house's utilities were in Amy's name: the existence of a good reason to hurry does not make this less a question of fact. And finally, the Hills are entitled to attempt to convince a jury that McIntyre was reckless not merely in selecting the wrong house but selecting any house.
 
 
 24
 We note that the question of McIntyre's exercise of the proper degree of care in identifying the Hills' house for a search is the sole issue against him which we remand. The Hills also argue that McIntyre unreasonably relied on remote hearsay of the confidential informant, but McIntyre's affidavit fully establishes the informant's reliability and the fact that his statements were relayed by a federal officer. Franks v. Delaware, 438 U.S. at 165, 98 S.Ct. at 2681; United States v. Ventresca, 380 U.S. 102, 107-09, 85 S.Ct. 741, 745-46, 13 L.Ed.2d 684 (1965).
 
 
 25
 Officers who Performed the Search. The remaining defendants are all officers who participated in the search of the Hills' home; McIntyre was not among them. The District Court, granting these officers a directed verdict, held that they relied on a valid search warrant when they entered the home; that the manner of their entry presented no constitutional violation; that their treatment of Christopher Hill and Alicia Hill, and of the property in the home, was reasonable under the circumstances; and that it was also reasonable to perform the search at night.
 
 
 26
 On appeal, the Hills argue that the District Court erred in its rulings on the fact of entry, the manner of entry, the destruction of personal property, and the treatment of Alicia. Any objection to the rulings on the treatment of Christopher and the late-night timing of the search has been waived.
 
 
 27
 In specifying the standard against which the officers' conduct must be measured, we note that this is a search issue, arising under the Fourth Amendment, not a case charging deprivation of liberty without due process of law under the Fourteenth Amendment. Thus, the rule of Baker v. McCollan, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1978), that the requirement of "due process of law" is met by a facially valid warrant that has been obtained by proper procedures even where it mistakes the identity of the person to be arrested, is not directly applicable. Id. at 145-46, 99 S.Ct. at 2694-95. Neither are the entry and actual search in this case subject to the rule of United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), as that case explicitly divorces the question of whether the Constitution is actually violated by the execution of a warrant from concerns germane to the exclusionary rule, and establishes its "good-faith" exception on policies peculiar to the latter. Id. at 905-13, 104 S.Ct. at 3411-15. Rather, the leading case here is Duncan v. Barnes, 592 F.2d 1336, 1338 (5th Cir.1979), stating that the test for the entry itself and all subsequent conduct is whether these are reasonable. As the Supreme Court has said, this is the "ultimate standard ... embodied in the Fourth Amendment." Michigan v. Summers, 452 U.S. 692, 699-700, 101 S.Ct. 2587, 2593, 69 L.Ed.2d 340 (1981). It is "an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a [person] of reasonable caution in the belief' that the action taken was appropriate?" Terry v. Ohio, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968) (quoting Beck v. Ohio, 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964)). Applying this standard to the present case, we conclude that the directed verdict was proper on the challenge to the officers' reliance on the warrant to conduct a search at 258 Philip Street, but that it was improper on the Hills' various challenges to the manner in which the search was conducted.
 
 
 28
 Even though Baker v. McCollan is not directly applicable to this case, it reminds us that officers conducting a search on the basis of a judicially approved warrant are entitled to rely to some extent on the warrant process to cure errors. After all, it is their job to execute the warrant, not to obtain it. Particularly where, as here, the warrant states on its face that identifying the correct place to be searched posed some difficulty, a reasonable officer would suppose that this difficulty had been addressed with some care by the officer seeking the warrant and the judicial officer issuing it. On these facts, we conclude that the Hills have failed to make a case that the officers were unreasonable in relying on the warrant's clear statement that 258 Philip Street was the house to be searched.
 
 
 29
 On the separate question whether the Hills have presented evidence sufficient to raise a jury question as to whether the manner in which the warrant was executed was reasonable, Duncan v. Barnes, 592 F.2d at 1338, we conclude that the directed verdict was improper. Under this rubric, therefore, we remand three questions for trial to a jury: were the officers reasonable in breaking open the front door, in detaining Alicia Hill at gunpoint, and in conducting a search as extensive as this one was?
 
 
 30
 As we recited above in our summary of the facts, Alicia and Christopher Hill stated that they were in bed when they heard a knock: Ronan testified that he heard running when he knocked; and all are agreed that Alicia and Christopher were the only occupants of the house at this time. Deciding whether it was reasonable for Ronan to order the door broken open requires a factfinding as to the circumstances in which he gave the order, and we hold that that factfinding must be made by a jury.
 
 
 31
 The District Court ruled that, because Alicia Hill was seventeen years of age at the time of the search, and because the search, as the warrant stated, involved two kilos of cocaine, the officers reasonably concluded that they had to detain Alicia and keep her under close surveillance. The Supreme Court has explained that such detentions in the course of otherwise valid searches for narcotics are reasonable because they prevent flight in case incriminating evidence is found, because they minimize risk to the officers, and because they reduce risk to the inhabitants. Michigan v. Summers, 452 U.S. at 702-03, 101 S.Ct. at 2594. In Summers, however, the Supreme Court explicitly founded the reasonableness of the detention on the existence of a probable cause and on the propriety of the search: "we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Id. at 705, 101 S.Ct. at 2595 (emphasis added). In this case, however, there is evidence that Sergeant Ronan perceived that the house was "perhaps" not a drug house in the first few minutes of the search, and yet that Alicia Hill was held under prolonged and frightening detention for anywhere from half and hour to an hour. The jury is entitled to determine whether detention of this duration was reasonable.
 
 
 32
 Finally, the Hills appeal the District Court's ruling that the claim against the officers for destruction of property was not supported by triable factual evidence. Of course, "officers executing search warrants must [often] damage property in order to perform their duty." Dalia v. United States, 441 U.S. 238, 258, 99 S.Ct. 1682, 1694, 60 L.Ed.2d 177 (1979) (dictum ). Once again, the standard is reasonableness, and in a Sec. 1983 action the District Court must determine not whether destruction was "reasonably necessary to effectively execute a search warrant" but whether the plaintiff has raised factual issues to be submitted to the jury on this point. Tarpley v. Greene, 684 F.2d 1, 9 (D.C.Cir.1982).
 
 
 33
 We specifically reject the defendants' argument that, because the Hills' claimed damage is "only" approximately $3,000, it is de minimis and therefore cannot rise to the level of a constitutional violation. The defendants' citation of Baker v. McCollan, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 is entirely off point, and Sec. 1983 does not state a minimum jurisdictional amount of damages.
 
 
 34
 We believe the plaintiffs have raised a fact issue here for the jury to decide. The photographs submitted in evidence show a home in total disarray. Though officers testified that items were scattered about when they entered, the Hills testified to the contrary. Finally, Ronan testified that he sensed soon after entering that the house did not appear to be a drug house, yet he permitted the destruction to continue for thirty minutes to an hour before heeding Alicia Hill--whom he then considered to be trustworthy--that the drug house was next door. On this record, we conclude that the Hills raised a factual issue as to the reasonableness of the destruction committed in their home which should have been sent to the jury.
 
 STATE LAW CAUSES OF ACTION
 
 35
 On appeal the Hills argue that the District Court improperly dismissed their claims under state law (assault and battery, intentional infliction of emotional distress, illegal entry, and unlawful detainer). They characterize the Court's ruling as a decision not to exercise pendant jurisdiction that was made in abuse of the discretion vested in the District Court.
 
 
 36
 The Hills mischaracterize the posture of these issues. The transcript reveals that the District Court did not dismiss state law claims: rather, it ruled that no state law claims appeared in the complaint. The transcript also reveals that the Hills' attorney fully concurred in this reading of the complaint. Tr. III-227-28. We conclude that any state law claims have been waived, and that the Hills may not appeal their dismissal without prejudice, from this litigation.
 
 CONCLUSION
 
 37
 The District Court's treatment of plaintiff's putative state law claims and its directed verdict for the City of Detroit are AFFIRMED. The District Court's directed verdict for McIntyre is VACATED, and the Sec. 1983 claim against McIntyre is REMANDED for further proceedings. The directed verdict for the remaining defendant officers on the Sec. 1983 claims arising from the officers' compliance with the warrant is AFFIRMED; and appeal from the directed verdict for these officers on the Sec. 1983 claims arising from the detention of Christopher Hill and the late-night timing of the search is deemed to have been waived. Finally, the directed verdict for the remaining defendant officers on the Sec. 1983 claims arising out of the manner of their entry, detention of Alicia Hill and damage to the Hills' personal property is VACATED, and these claims are REMANDED for further proceedings.
 
 
 
 [1]
 We note this claim is brought against McIntyre as an individual, and thus does not fall within the rule announced by this Court in Collins v. City of Detroit, 780 F.2d 583 (6th Cir.1986) (mistaken search of wrong house actionable only under Monell standard if filed against officers acting in their official capacity)