David HARTZLER, et al., Plaintiffs,

v.

The LICKING COUNTY HUMANE SOCIETY, et al., Defendants.

No. C2–88–884.

United States District Court, S.D. Ohio, E.D.

June 29, 1990.

Angelo F. Lonardo and Leonard W. Yelsky, Yelsky & Lonardo, Cleveland, Ohio, for plaintiffs.

Gregory D. Rankin, Lane, Alton & Horst, Columbus, Ohio, for defendants.

## ORDER

GRAHAM, District Judge.

This case arises out of a search of the farm of plaintiff David Hartzler, the seizure of his Morgan horses, and his arrest and prosecution on a charge of cruelty to animals. In March and April, 1987 defendant Judith A. Jones, an employee of the Licking County Humane Society, received complaints from two of plaintiff's neighbors that he was neglecting the horses he kept at his farm near Centerburg, Ohio. Defendant Jones was employed by the Licking County Humane Society as a humane agent under the provisions of Ohio Rev.Code § 1717.06. Such agents are appointed "for the purpose of prosecuting any person guilty of an act of cruelty to persons or animals" and they have the power to arrest persons found violating laws "protecting persons or animals or preventing acts of cruelty thereto." *Id.*

Plaintiff is the proprietor of an insurance agency located in Worthington, Ohio. For a number of years he has been active in breeding, raising, and showing Morgan horses, and has received numerous prizes and awards for his horses. He conducts his Morgan horse operation on a fifty acre farm in Knox County where he resides. Plaintiff and his wife separated in 1986. Mrs. Harztler left the family home with one of their three children. Two children, Amy and Jody, remained with plaintiff. The Hartzlers then became embroiled in a divorce proceeding and a custody dispute.

On March 30, 1989, one of Hartzler's neighbors, Mrs. Bonnie Pastor, called the Licking County Humane Society and reported that she had noticed a significant change in the condition of plaintiff's horses. She reported that the horses appeared to be undernourished and she asked the Society to investigate. Shortly thereafter, another neighbor, Rhonda Flinn, who lives directly across the road from the Hartzler farm, made a similar report to the Humane Society. Mrs. Flinn reported that she had observed the Hartzler horses becoming thinner and thinner over a period of months and that they appeared to be lethargic and deprived of adequate water and feed. Both Mrs. Pastor and Mrs. Flinn were themselves experienced in owning, breeding, and raising horses.

Defendant Jones, who worked in a veterinarian's office for three and a half years and has been around horses all her life, began an investigation in response to the complaints of Mrs. Pastor and Mrs. Flinn

which included three visits to plaintiff's farm. She visited Mrs. Flinn and observed the Hartzler horses from Mrs. Flinn's property. She also established contact with plaintiff's estranged wife, who made various allegations about her husband's conduct, not only with respect to the horses, but also with respect to his personal conduct. Sometime in early April, Ms. Jones consulted the assistant law director of the City of Newark, William Rickrich, for his advice regarding a search warrant to search the Hartzler farm. Mr. Rickrich advised her to continue to monitor the situation and to have a veterinarian accompany her to the farm to observe the horses from the neighbor's property. He also advised her to take photographs and prepare a diagram of the premises. Ms. Jones then contacted veterinarian Louis W. Bremer, and on April 9, 1987, Dr. Bremer accompanied Ms. Jones to the Hartzler farm where he observed the horses from the adjoining property. Based upon his observations, Dr. Bremer concluded that the horses were underfed, underwatered and not given adequate shelter.

Sometime in late April, Ms. Jones returned to Mr. Rickrich's office and presented him with a two-page statement outlining the results of her investigation, a copy of Dr. Bremer's report, photographs of the horses, a diagram of the premises, and a statement of her subsequent observations on April 25, 1987 which revealed no change in the condition of the horses. Mr. Rickrich was satisfied that probable cause existed for the issuance of a search warrant. He proceeded to prepare the search warrant affidavit and took Ms. Jones to Judge Gregory Frost of the Licking County Municipal Court on the morning of April 27, 1987. Judge Frost reviewed the affidavit and attached documents, had Ms. Jones swear to the affidavit and granted the search warrant.

Ms. Jones arrived at the Hartzler farm to execute the warrant at approximately 11:30 A.M. She was accompanied by Mr. Rickrich, Dr. Bremer, and other individuals she had contacted to assist in transporting the horses, if necessary. Mrs. Pastor noticed the activity and stopped out of curiosity.

All of the individuals who were present with Ms. Jones at the time of the search testified that the horses were in deplorable condition and that there was no food or water present on the premises. Much of this testimony was quite graphic, for instance Mr. Smith, a local farmer who was hired to move some of the horses, testified that one of them was more thirsty than any animal he had ever seen and that they were so hungry that they ate the straw on the floor of his livestock trailer which was contaminated with pig feces. Ms. Jones testified that upon observing the condition of the horses in their environment, she decided to seize them pursuant to the warrant and to file a criminal complaint against plaintiff for violating Ohio Rev.Code § 959.13(A)(1), Cruelty to Animals, a second degree misdemeanor under Ohio law.

Thereafter, Mr. Rickrich requested an arrest warrant based upon the complaint signed by Ms. Jones. Plaintiff was arrested that afternoon and transported to the Licking County Jail, where he was held overnight. Plaintiff's arrest and the seizure of his horses received considerable attention in the local media and local television stations filmed the horses and his arraignment. Plaintiff pled not guilty to the criminal charges and he was acquitted by a jury on October 22, 1987. His horses remained in the custody of the Licking County Humane Society until his acquittal.

Plaintiff subsequently brought the present action against the Licking County Humane Society and defendant Jones asserting claims for damages under 42 U.S.C. § 1983, alleging that defendants' actions violated his rights under the Fourth and Fourteenth Amendments to the United States Constitution. Plaintiff also asserted pendent state claims for malicious prosecution and libel.

This case proceeded to trial before a jury on February 12, 1990. At the trial, plaintiff testified that he had always provided proper care for his horses, but that he had become concerned about their condition in March, 1987, when he noticed that they had lost weight. Plaintiff testified that he believed the horses had a parasite problem

and he consulted his trainer, who advised that he change the "wormer" medication he was using. Plaintiff attributed the condition of his horses to parasite infestation and maintained that they had always received adequate amounts of food and water.

Plaintiff's babysitter, Emily Honiker, testified that she had begun working for plaintiff in September, 1986, watching his children after they returned from school in the afternoon. Ms. Honiker testified that there was hay in the barn and that she had never seen the horses deprived of food or water. Ms. Honiker would arrive between 2:30 and 3:00 p.m. and leave between 6:00 and 7:30 p.m. She would sometimes feed the horses in the evening.

Plaintiff's trainer, Catherine Swartz, who sometimes co-owned horses with him, testified that she had visited his farm in March, 1987. At this time, she noted that there was feed on the farm and that the horses were being fed, although she did note that there were three horses which appeared to be rather thin and she had a conversation with plaintiff about changing their medication. She said she was somewhat concerned about the condition of these three horses, describing them as "quite thin with some reduction of muscle mass." She recommended immediate worming, but plaintiff's records indicate that this was not done until April 2, 1987. Ms. Swartz testified that at the time of her visit in March, she saw no evidence of starving horses and that her observation of the Hartzler horses on May 2, 1987, shortly after they were seized, revealed that they were in good health.

The evidence revealed that the investigation of the Hartzler horses occurred at a time when the Licking County Humane Society was experiencing financial difficulties and was considering eliminating the office of humane agent. Ms. Jones was actively involved in soliciting support from the communities served by the Humane Society and from the law enforcement agencies of those communities and community groups. She had made a presentation to the Licking County Veterinarian Society on March 10, 1987. Dr. Bremer was in attendance at this meeting and the Veterinarian Society made various recommendations to increase community support for the Humane Society, including increased publicity of its activities. Dr. Bremer was one of several veterinarians who provided spaying and neutering services to the Society on a fee-paying basis. In August, 1987, Dr. Bremer became a member of the Board of Directors of the Society.

Fanchon Lewis, who was President of the Licking County Humane Society in 1987, testified that when a complaint of cruelty to animals was received it was the Society's policy to notify the animal owner prior to the filing of criminal charges. Ms. Jones testified that she attempted to contact plaintiff by telephone, but was unable to do so because his home phone was disconnected. The evidence revealed, however, that plaintiff's home telephone was operable during the month of April, 1987 and that both his home and office phones were listed in the applicable telephone directories.

Plaintiff's theory of the case was that Ms. Jones, motivated by a desire to generate publicity for her position in order to retain her employment, failed to conduct an impartial investigation of the complaints regarding the condition of his horses and made intentional or reckless misrepresentations for the purpose of obtaining a search warrant.

On February 16, 1990, the jury returned verdicts as follows: (1) for the plaintiff on his § 1983 claim for unlawful search and seizure, (2) for defendant Jones on plaintiff's § 1983 claims for unlawful arrest and unlawful prosecution, (3) for the defendants on plaintiff's state law claims of malicious prosecution, and (4) for the defendant Licking County Humane Society on plaintiff's claim of libel. The jury awarded plaintiff the sum of $50,000.00 compensatory damages on his § 1983 claim for unlawful search and seizure and made a finding that defendant Jones acted recklessly as opposed to intentionally.

The matter is now before the Court on defendant Jones's motion for judgment not-

withstanding the verdict and her alternative motions for a new trial and for a remittitur. The motion was filed on March 28, 1990 and the Court held a hearing on the motion on May 23, 1990.

## I. MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT

■ It is well settled that in considering a motion for judgment notwithstanding the verdict, the Court must view the evidence in the light most favorable to the party who secured the jury verdict. "[E]vidence must be viewed in the light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in his favor." *Morelock v. NCR Corp.*, 586 F.2d 1096, 1104 (6th Cir.1978), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979). *See also Gilham v. Admiral Corp.*, 523 F.2d 102, 109 (6th Cir.1975), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1113, 47 L.Ed.2d 318 (1976); *Perry v. Gulf, Mobil & Ohio R.R.*, 502 F.2d 1144 (6th Cir.1974).

■ A law officer who obtains an invalid search warrant by making material false statements in the warrant affidavit, either knowingly or in reckless disregard for the truth, is liable under 42 U.S.C. § 1983. *Donta v. Hooper*, 774 F.2d 716, 718 (6th Cir.1985), *cert. denied*, 483 U.S. 1019, 107 S.Ct. 3261, 97 L.Ed.2d 760 (1987). This rule has its genesis in *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), wherein the Supreme Court held that a search issued on the basis of such an affidavit is a constitutional violation under the Fourth Amendment. In *Franks*, 438 U.S. at 155–156, 98 S.Ct. at 2676–2677, the Court summarized its holding as follows:

[W]e hold that, where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, ... and that at [a] hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

However, if sufficient untainted evidence was presented in the affidavit to establish probable cause, the warrant is valid. *United States v. Karo*, 468 U.S. 705, 719, 104 S.Ct. 3296, 3305, 82 L.Ed.2d 530 (1984); *United States v. Campbell*, 878 F.2d 170 (6th Cir.1989).

The *Franks* Court recognized that probable cause may be founded on hearsay and information received from private citizens, even anonymous informants. *Franks*, 438 U.S. at 164–165, 98 S.Ct. 2680–2681. The Court in *Franks* also restricted its holding, noting that the "deliberate falsity or reckless disregard whose impeachment is permitted ... is only that of the affiant, not of any nongovernmental informant." *Id.*, 438 U.S. at 171, 98 S.Ct. at 2684.

While the Court is the factfinder in a suppression hearing in a criminal case, in a § 1983 action, fact-finding under the *Franks* standard is the province of the jury. *Hill v. McIntyre*, 884 F.2d 271, 175 (6th Cir.1989). In general, a determination of whether there was probable cause for a search which gave rise to a § 1983 action is a question to be determined by a jury unless there is only one reasonable determination. *Yancey v. Carroll County, Kentucky*, 876 F.2d 1238, 1243 (6th Cir.1989).

In *Ross v. Meyers*, 883 F.2d 486, 488 (6th Cir.1989), a diversity action involving claims of false arrest, false imprisonment, and malicious prosecution, the Sixth Circuit said:

The inquiry as to the existence of probable cause is fact-specific and great deference is required to be assigned to the jury's findings of fact as to the issue. *See Yancey v. Carroll County, Kentucky*, 876 F.2d 1238 (6th Cir.1989) (probable cause determination is to be made by jury unless there is only one reasonable outcome). As with other jury verdicts, the evidence must be construed most strongly in favor of the verdict and

all credibility decisions must be resolved in favor of the verdict. *E.g., Ratliff v. Wellington Exempted Village Schools Bd. of Educ.*, 820 F.2d 792 (6th Cir.1987).

The statement of Judith Jones which was incorporated into the search warrant affidavit contains statements which the jury could legitimately have found were both false and recklessly made. On the second page of her statement, Ms. Jones recited the fact that Mr. and Mrs. Hartzler were in the process of a divorce

and Mrs. Hartzler is terrified of this man. He is an alcoholic with an extremely violent temper. Due to this we feel certain that he will not cooperate in any way.

She went on to state that

Mr. Hartzler is now being investigated by Licking County Children's Services for child abuse. We have postponed requesting this search and seizure warrant because everyone concerned was afraid that if he got wind of the fact that there were any investigation going on by us or by Children's Services that he might take off with the children.

All of this information apparently came from Mrs. Hartzler who obviously was a biased informant and whose credibility should have been questioned by Ms. Jones. Ms. Jones's statement, however, makes it fairly clear that Mrs. Hartzler was the source of this information and that the Hartzlers were involved in divorce and child custody litigation. Thus she revealed to Judge Frost the circumstances affecting the credibility of these statements.

The first paragraph of Ms. Jones's statement reads as follows:

3–30–87 I received the first of several complaints on horses belonging to David Hartzler at 7284 Lock Road, Centerburg. All the complaints were of the same nature starvation and neglect. The complainants stated that the horses were in extremely bad shape, very thin, very lethargic and some that would just stand in one place for hours because they were too weak to move around much.

This paragraph accurately describes the complaints Ms. Jones received from Mrs. Pastor and Mrs. Flinn. Indeed, plaintiff did not challenge the truthfulness of Ms. Jones's recitation of those complaints, but instead she challenged the veracity of the complainants Mrs. Pastor and Mrs. Flinn on the grounds that they were allied with Mrs. Hartzler in her divorce and custody litigation. Plaintiff produced no direct evidence of this. As to Mrs. Pastor, there was no evidence that she had any relationship whatsoever with Mrs. Hartzler. Plaintiff attacked her credibility solely on the grounds that she was a friend of Mrs. Flinn and that Mrs. Flinn was allegedly a friend of Mrs. Hartzler. The only evidence of a relationship between Mrs. Flinn and Mrs. Hartzler was Mrs. Flinn's testimony that they had been neighbors and that their children played together. There was no evidence of collaboration between Mrs. Hartzler and Mrs. Pastor or Mrs. Flinn, nor any evidence that Ms. Jones was aware of any relationship between them which would have caused her to doubt the credibility of the complaints they related to her. Finally, all of the principal witnesses, including plaintiff and his trainer, concede that some of the horses appeared thin and malnourished.

The second paragraph of Ms. Jones statement reads as follows:

I proceeded to take Dr. Louis Bremer with me and we went to see the horses, due to the circumstances we did not want to enter the property without permission, so we had to make our observations from the road and also from the neighbors property. Several of the horses were so thin that you could count every bone in their bodies. There were others that were in better shape but only marginally. During our observations we did not see any food out nor any residue the water buckets were empty and the horses were nosing them around looking for water.

This is an accurate description of the observations made by Ms. Jones and Dr. Bremer on April 9, 1987. Dr. Bremer's report was attached as Exhibit B to the search warrant affidavit and concluded with his opinion that "I feel that the horses on this farm are not being cared for in a manner consist-

ent with good husbandry practice. They are underfed, underwatered, and not given adequate shelter to protect them from the elements."

Plaintiff attacked Dr. Bremer's opinion on cross-examination on the grounds that his diagnosis was made without the benefit of a physical examination of the horses and with the use of field glasses from a distance ranging from ten to fifteen feet up to one hundred yards. Dr. Bremer testified that he was able to make a sufficient observation to reach the conclusions stated in his report. The only other evidence offered by plaintiff in an attempt to show that it was not reasonable for Ms. Jones to rely on Dr. Bremer's opinion was the suggestion that Dr. Bremer's opinion was tainted by his relationship with the Humane Society. The evidence showed that the Society did pay Dr. Bremer and a number of other local veterinarians for spaying and neutering small animals. There was no evidence as to the amount of compensation he received for such services. It was further shown that Dr. Bremer was present at a meeting of the Licking County Veterinarian Society when Ms. Jones spoke to the group as part of her efforts to enlist community support for the preservation of the office of Humane Agent, and that the veterinarians suggested various strategies to generate community support, including increased publicity. There is no evidence of Bremer's role, if any, in this meeting. The only other evidence of a special relationship between Bremer and the Humane Society was the fact that Bremer was elected to fill a vacancy on the Board of Directors of the Humane Society in August, 1987, four months after the search of the Hartzler farm. On this basis plaintiff argues that Bremer's opinions were tainted by his business relationship with the Humane Society and his interest in generating additional publicity for its operation.

The third paragraph of Ms. Jones' statement reads as follows:

Rhonda Flinn who lives across the road from Mr. Hartzler, has told me of one incident in particular where a mare went down in her stall and laid their [sic] thrashing for 24 hours before it died, Mr.

Hartzler was aware of this and was asked by one of his daughters to call the vet, but he refused, this incident was verified by Mrs. Hartzler. During the last snow storm we had, the horses were left out, there is not even a tree to act for a windbreak for these animals, if we had had a more severe winter there are five horses that would definitely not have made it.

This paragraph is an accurate recitation of information provided by Mrs. Flinn to Ms. Jones. The evidence revealed that part of the information related by Mrs. Flinn about the mare that died was based upon hearsay information Mrs. Flinn received from her daughter, who in turn received it from one of the Hartzler girls. However, the evidence further showed that Mrs. Flinn did have firsthand knowledge of a corroborating fact, namely, that she personally observed plaintiff remove the body of a dead horse from the barn and bury it on his property. As noted above, plaintiff challenged Mrs. Flinn's veracity and the reasonableness of Ms. Jones' reliance upon her statements on the grounds of her alleged collaboration with Mrs. Hartzler.

■ The issue before this Court is whether the jury, based upon the evidence presented at trial, could reasonably find that the information provided to the magistrate by Ms. Jones and indirectly by the various other witnesses who related information to Ms. Jones was false to such an extent as to mandate a finding that there was no probable cause to search plaintiff's farm.

Plaintiff relied heavily on the argument that Ms. Jones made no serious effort to contact him concerning the condition of the horses, despite the fact that it was the Society's custom and practice to do so. Even if Ms. Jones's reasons for not doing so are rejected, her failure to do so would not, as a matter of law, defeat a finding of probable cause. Law enforcement officers have never been required under the Fourth Amendment to obtain a suspect's view of the reliability of the information suggesting that the suspect has committed a crime, or to conduct a full-scale investigation of

the circumstances prior to obtaining a warrant. Rather, it is the task of the magistrate to weigh and evaluate the quantum and quality of the information which the officer does possess to determine if that information is sufficient for a finding of probable cause. However, if indeed the jury did conclude that Ms. Jones did not follow standard procedure prior to obtaining a warrant, it could consider this in evaluating her credibility and in deciding whether she knowingly or recklessly provided false information to the magistrate.

The Court concludes that sufficient evidence was introduced to create a jury question on the issue of Ms. Jones's credibility, including evidence that her position as humane agent was in jeopardy. There was also sufficient evidence to create an issue for the jury regarding the reliability of the statements provided to Ms. Jones by Mrs. Hartzler.

In regard to the information provided by Dr. Bremer, Mrs. Pastor and Mrs. Flinn, the Court concludes that plaintiff failed to introduce any evidence which would bring this information into question. Plaintiff argued that Mrs. Pastor was a friend of Mrs. Hartzler, and that Mrs. Flinn was a friend of Mrs. Pastor, and that therefore their information was suspect. However, plaintiff introduced no evidence at trial to support this theory. There was simply no evidence produced at trial from which the jury could reasonably conclude that the information provided by these witnesses was false. Plaintiff also sought to impugn Dr. Bremer's information. However, there was no evidence that Dr. Bremer had any interest in the continuation of the position of humane agent, nor could the fact that some months after the search, he agreed to serve on the Society's board of directors have any impact on the truth of his statements at the time of the warrant.

Plaintiff introduced evidence that the horses were being given food and water at the time of the search, but he acknowledged that the horses were thin. Even assuming that plaintiff was feeding the horses at the time, this evidence does not contradict Dr. Bremer's observations.

Plaintiff also introduced the testimony of Ms. Swartz that she visited the farm in March of 1987 and that the horses were thin, but that she saw the horses on May 2, 1987, shortly after they were seized, and they appeared to be in good health. Again, this evidence does not conflict with Dr. Bremer's report.

The jury could not reasonably find from the evidence that Ms. Jones knowingly or recklessly provided false information to the Magistrate insofar as the statements of Mrs. Pastor, Mrs. Flinn, and Dr. Bremer are concerned. The Court finds that the unrefuted statements of Mrs. Pastor, Mrs. Flinn and Dr. Bremer provided to the magistrate in the affidavit are sufficient in themselves to establish probable cause as a matter of law in this case, even if Ms. Jones's statements concerning her own observations and the information provided by Mrs. Hartzler are assumed to be false and are completely disregarded. Accordingly, the Court finds that there was only one reasonable determination on the issue of probable cause which the jury could have made, and defendant Jones is entitled to judgment notwithstanding the verdict.

## II. MOTION FOR A NEW TRIAL

In the alternative to her motion for judgment notwithstanding the verdict defendant Jones moves the Court for a new trial pursuant to Fed.R.Civ.P. 59. Defendant Jones first argues that the jury's verdict in favor of the plaintiff on his § 1983 action for illegal search and seizure is inconsistent with the jury's verdicts in favor of the defendants on plaintiff's § 1983 claims for unlawful arrest and malicious prosecution and his state law claim for malicious prosecution. Second, defendant argues that the jury's verdict in favor of the plaintiff on his § 1983 claim for illegal search and seizure was against the manifest weight of the evidence.

### A. INCONSISTENCY OF VERDICTS

As a general matter, it has been stated:

That a verdict must be consistent appears to be a principle not often squarely decided, at least so far as civil actions

are concerned, but rather one that has been generally assumed. But the rule has been laid down that a verdict does not necessarily have to be set aside on appeal because of its inconsistency with another verdict. It is only when a judgment rests on some particular finding for its validity and support that the contradictoriness between two findings treating of the same essential matter will necessitate a reversal. It is of no consequence that an immaterial finding cannot be reconciled with other findings.

76 Am.Jur.2d, *Trial*, § 1154, pages 122, 123.

The issue of consistency of civil verdicts often arises in litigation involving the claims of spouses where one spouse is asserting a solely derivative claim such as a claim for loss of services, consortium, or medical expenses resulting from an injury to the other spouse, and the jury finds in favor of one plaintiff and not the other. *See e.g.* Annotation, *Validity of Verdict in Personal Injury Action Which Awards Damages to Plaintiff Wife, but either Finds Against Plaintiff Husband Seeking to Recover Medical Expenses and the Like, or Awards Nothing to Him*, 36 A.L. R.2d 1333 (1954); Annotation, *Validity of Verdict or Verdicts by Same Jury in Personal Injury Action Awarding Damages to Injured Spouse but Denying Recovery to Other Spouse Seeking Collateral Damages, or Vice Versa*, 66 A.L.R.3d 472 (1975). The issue can also arise in cases involving vicarious liability as in a situation where a jury finds in favor of the agent but against the principal. *See, e.g., Eckleberry v. Kaiser Foundation, Northern Hospitals*, 226 Or. 616, 359 P.2d 1090 (1961).

The issue also frequently arises in products liability litigation in which various theories of liability are submitted to the jury and they find in favor of the plaintiff on some theories, but in favor of the defendant on others. *See*, Annotation, *Products

*Liability: Inconsistency of Verdicts on Separate Theories of Negligence, Breach of Warranty, or Strict Liability*, 41 A.L. R.4th 10 (1985).

■ Generally, courts strive to harmonize apparently inconsistent verdicts, but when it is impossible to do so will set them aside. *See, e.g., Werner v. Upjohn Co., Inc.*, 628 F.2d 848, 860 (4th Cir.1980). The rule in criminal cases is the opposite, namely, consistency of verdicts is not required. *Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932).[1]

Many of the reported cases which discuss inconsistency of verdicts arise out of cases involving special verdicts. In *Gallick v. Baltimore & Ohio Railroad Co.*, 372 U.S. 108, 119, 83 S.Ct. 659, 666, 9 L.Ed.2d 618 (1963), the Supreme Court said that if there is a fatal inconsistency among the jury's findings, they cancel one another out necessitating a judgment for the defendant or at least a new trial, but it is the duty of the courts to attempt to harmonize the answers if it is possible under a fair reading of them. *See also Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962).

The Fifth Circuit has developed a jurisprudence on the subject of inconsistency of jury verdicts in a series of reported cases, the holdings of which are summarized in the following quotation from a decision of the Eleventh Circuit in *Witt v. Norfe, Inc.*, 725 F.2d 1277, 1278 (11th Cir.1984):

"A finding by this court that a critical verdict was inconsistent with another would require a remand for a new trial (citation omitted) since we could not speculate which inconsistent finding the jury intended to be controlling." *Miller v. Royal Netherlands Steamship Co.*, 508 F.2d 1103 (5th Cir.1975). In order to qualify as inconsistent, however, there must be "no rational, non-speculative

1. In *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1094 (5th Cir.1973), the court held that there was no need for general verdicts in a civil case to be consistent. The court cited only criminal cases, including *Dunn v. United States*, and this holding seems to be inconsistent with the vast weight of authority. Indeed, most courts presented with the question seem to assume that inconsistency renders the verdict invalid and spend most of their time determining whether or not there is inconsistency.

way to reconcile ... two essential jury findings." *Higginbotham v. Ford Motor Co.,* 540 F.2d 762, 773 (5th Cir.1976). "Answers should be considered inconsistent ... only if there is no way to reconcile them.... Even a jury verdict inconsistent on its face is not inconsistent if it can be explained by assuming the jury reasonably misunderstood the instructions." *Willard v. Hayward,* 577 F.2d 1009, 1011 (5th Cir.1978).

In *Miller v. Royal Netherlands Steamship Co.,* 508 F.2d 1103, 1106–1107 (5th Cir.1975), the court said that the test to be applied in reconciling apparent conflicts between jury's answers "is whether the answers may fairly be said to represent a logical and probable decision on the relevant issues as submitted." In *Higginbotham v. Ford Motor Co.,* 540 F.2d 762, 773 (5th Cir.1976), the court reversed because "we can find no rational, non-speculative way to reconcile these two essential jury findings."

■ The Court concludes that there is no rational, non-speculative way to reconcile the essential jury findings which necessarily form the basis for the verdicts rendered in this case. The jury returned a verdict in favor of the plaintiff on his § 1983 action for unlawful search and seizure. In order to return such a verdict, the jury must have found that defendant Jones made false statements in the search warrant affidavit without which Judge Frost would not have found probable cause for the issuance of a warrant. The jury answered an interrogatory finding that the false statements were recklessly made. The jury then found in favor of defendant Jones on plaintiff's § 1983 claims for unlawful arrest and unlawful prosecution, and they found in favor of the defendants on plaintiff's state law claim for malicious prosecution. The inconsistency between these verdicts lies in the fact that the same evidence which was relied upon to support a finding of probable cause for the search and seizure also formed the basis for the arrest and prosecution. The jury could not logically find that this evidence did not support a finding of probable cause for the issuance of the search warrant while at the same time finding that it did support probable cause for the arrest and prosecution. Yet this is precisely what the jury did.

This inconsistency is further highlighted by the fact that the jury submitted a question to the Court during its deliberations and in response was specifically instructed that in the event they found that the search was illegal, they could not consider any evidence resulting from the search in determining whether probable cause existed for the arrest and prosecution. The jury's question was as follows:

"Hypothetically, if the jury has determined that probable cause to obtain a search warrant did not exit, would an arrest—based on probable cause determined from a search conducted with the warrant in hand—be valid?"

The Court's written response was as follows:

Members of the Jury:

If the defendant obtained a search warrant by knowingly or recklessly misrepresenting material facts in the affidavit for the search warrant, then she would not be entitled to rely on evidence produced by the search in determining whether or not probable cause existed for the arrest. If probable cause did not exist for the issuance of the search warrant but defendant did not knowingly or recklessly misrepresent material facts contained in the affidavit for the search warrant issued by Judge Frost, then she was entitled to consider the evidence produced by the search in determining whether or not probable cause existed for the arrest.

The jury's verdict for the plaintiff which must be based on a determination that the evidence did not support a finding of probable cause for the issuance of the search warrant is inconsistent with its verdicts in favor of the defendants which must rest upon a finding that the same evidence did support probable cause for the arrest and prosecution. There is no rational, non-speculative way to reconcile these verdicts, nor can they be explained on the basis of some reasonable misunderstanding of the

Court's instructions. They are inconsistent and must be set aside.

## B. WEIGHT OF THE EVIDENCE

In *Duncan v. Duncan*, 377 F.2d 49, 52 (6th Cir.1967), the court stated:

In ruling upon a motion for a new trial based on the ground that the verdict is against the weight of the evidence, a district judge must compare the opposing proofs and weigh the evidence, and "it is the duty of the judge to set aside the verdict and grant a new trial, if he is of the opinion that the verdict is against the clear weight of the evidence * * *." The power of the trial judge to set aside a verdict as against the weight of the evidence and grant a new trial is thus a check or limitation on the jury's power to render a final and binding verdict, to the end that a miscarriage of justice does not result. However, "[c]ourts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." Thus, while the district judge has the duty to intervene in appropriate cases, the jury's verdict should be accepted if it is one which could reasonably have been reached. (Citations omitted).

*See also TCP Industries, Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 546 (6th Cir.1981). "On a new trial motion, unlike on a motion for JNOV, the trial court may weigh the evidence." *Moran v. Johns–Manville Sales Corp.*, 691 F.2d 811, 816 (6th Cir.1982).

■ The Court has reviewed the evidence in this case in detail in the first section of this opinion and order. The Court finds that the verdict in favor of the plaintiff on his § 1983 claim for unlawful search and seizure is against the manifest weight of the evidence. While the jury would have been well within its province in determining that the statements contained on page two of Ms. Jones' written statement which was incorporated into the search warrant affidavit was in whole or in part false and recklessly made, nevertheless the evidence does not support a finding that the statements contained on the first

page of her statement were false or recklessly made or that the statements and opinions expressed in Dr. Bremer's report which was also incorporated into the search warrant affidavit were false or recklessly made, and those statements standing alone are sufficient to establish probable cause for the issuance of a warrant. The elements of the offense under investigation included depriving an animal of necessary sustenance or confining an animal without supplying it with a sufficient quantity of good wholesome food and water. See Ohio Rev.Code § 959.13. The statements of Mrs. Pastor and Mrs. Flinn and the observations and opinions of Dr. Bremer are sufficient to constitute probable cause for the belief that a search of the Hartzler premises would reveal evidence of the commission of this offense and there was no credible evidence that Ms. Jones acted with reckless disregard for the truthfulness of the information supplied by Mrs. Pastor, Mrs. Flinn, and Dr. Bremer when she included such information in her search warrant affidavit. The jury's verdict in favor of the plaintiff on his § 1983 action for unlawful search and seizure is against the clear weight of the evidence and amounts to a miscarriage of justice.

## III. REMITTITUR

■ In the alternative to her motions for judgment notwithstanding the verdict and for a new trial, defendant Jones has moved the Court for a remittitur asserting that the jury's award of $50,000.00 in compensatory damages on plaintiff's § 1983 claim for unlawful search and seizure bears no reasonable relationship to the evidence produced at trial regarding plaintiff's damages. It has long been the rule that a federal district court has the power to condition the denial of a motion for a new trial upon consent to a remittitur. *Dimick v. Schiedt*, 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603 (1935); *Smith v. John Swafford Furniture Co., Inc.*, 614 F.2d 552, 553 (6th Cir.1980). The practice of remittitur is ancillary to the trial court's authority to grant a new trial on the grounds that the verdict is excessive.

*Mooney v. Henderson Portion Pack Co., Inc.*, 339 F.2d 64, 66 (6th Cir.1964). The standard for determining the excessiveness of a verdict is the amount which, under the evidence in the case, was the maximum that the jury reasonably could find to be compensatory for the plaintiff's loss. *Manning v. Altec, Inc.*, 488 F.2d 127, 132 (6th Cir.1973); *Urseth v. City of Dayton*, 680 F.Supp. 1150, 1152 (S.D.Ohio 1987).

██ As explained in detail above, the jury found in favor of the plaintiff on his § 1983 claim for unlawful search and seizure, but found in favor of defendants on plaintiff's § 1983 claims for unlawful arrest and unlawful prosecution and on his state law claims for malicious prosecution. Thus, inexplicably, the jury found that probable cause did not exist for the issuance of the search warrant, but that probable cause did exist for the subsequent arrest and prosecution. Assuming *arguendo* that there was some way to reconcile these inconsistent verdicts, it would nevertheless be impossible to justify an award of $50,000.00 in compensatory damages for the consequences of the search. The search, standing alone, involved at most a temporary violation of plaintiff's constitutional rights when defendant Jones and others entered upon his premises and searched his barns. His horses were seized for use as evidence in the criminal prosecution which, under the jury's findings, was a lawful prosecution. Plaintiff offered no evidence that any damage occurred to his premises during the search. Plaintiff's evidence of damages centered around the damage to his reputation in general and his reputation as a breeder and shower of Morgan horses, and mental anguish and legal expenses all of which flowed from his arrest and prosecution not the search and seizure. Again, the jury found that his arrest and prosecution were lawful. The evidence simply does not support an award of $50,000.00 in damages for a trespass on plaintiff's property or a temporary seizure of his horses pending the institution of criminal charges which were filed the same day.

If the jury's finding of liability on plaintiff's § 1983 claim for unlawful search and seizure were permitted to stand, he would be entitled to recover at most nominal damages for the unconstitutional trespass and temporary interference with his property right in his horses. The Court believes that such an award could not properly exceed $5,000.00. Accordingly, the Court conditionally grants defendants' motion for a remittitur. In the event this Court's Order granting defendants' a new trial on the issue of liability on plaintiff's Section 1983 claims for wrongful search and seizure should be reversed, the Court hereby grants defendant a new trial on the issue of damages unless plaintiff consents to a remittitur reducing the verdict to the sum of Five Thousand Dollars ($5,000.00).

## CONCLUSION

Defendants' motion for judgment notwithstanding the verdict is granted. Defendants' motion for a new trial is conditionally granted and defendants' motion for a remittitur is likewise conditionally granted. The Clerk shall enter final judgment in favor of defendant Jones. The costs of this action are assessed against the plaintiff.

It is so ORDERED.