131 Nev., Advance Opinion 102

# IN THE COURT OF APPEALS OF THE STATE OF NEVADA

JUDY PALMIERI,
Appellant,
vs.
CLARK COUNTY, A POLITICAL
SUBDIVISION OF THE STATE OF
NEVADA; AND DAWN STOCKMAN,
CEO96, INDIVIDUALLY AND IN HER
OFFICIAL CAPACITY AS AN OFFICER
EMPLOYED BY THE COUNTY OF
CLARK,
Respondents.

No. 65143



FILED

DEC 31 2015

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Appeal from a district court order granting summary judgment in a civil rights and a torts action. Eighth Judicial District Court, Clark County; Gloria Sturman, Judge.

*Affirmed.*

Potter Law Offices and Cal J. Potter, III, and Cal J. Potter, IV, Las Vegas, for Appellant.

Steven B. Wolfson, District Attorney, and Matthew J. Christian, Deputy District Attorney, Clark County, for Respondents.

---

BEFORE GIBBONS, C.J., TAO and SILVER, JJ.

3/21/16: Corrected per letter to publishers. CJ

15-901705

## OPINION

By the Court, SILVER, J.:

Appellant Judy Palmieri was criminally charged after a search of her residence revealed several violations of the Clark County Code's provisions for the health and welfare of animals. In obtaining the warrant to search Palmieri's residence, respondents Dawn Stockman and Clark County relied in part on a tip from an informant who, Palmieri later alleged, provided a false identity when she filed a complaint against Palmieri. After Palmieri obtained the evidence underlying her allegation that the informant provided a false identity, Palmieri sued Stockman and Clark County, asserting a 42 U.S.C. § 1983 claim, a *Monell*[1] claim, and several state law causes of action. Respondents moved for summary judgment, which the district court granted.

On appeal, the primary issue is whether the district court erred by granting summary judgment with respect to Palmieri's § 1983 claim against Stockman based on a finding that Stockman was entitled to qualified immunity.[2] We hold that Stockman was entitled to qualified

---

[1]*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

[2]Palmieri also challenges the portions of the district court's order granting Clark County summary judgment on her *Monell* claim and Stockman summary judgment on her claims for negligent and intentional infliction of emotional distress, conspiracy, and malicious prosecution. We have considered these arguments, and they lack merit because, as fully discussed below, we conclude that there was administrative probable cause sufficient to support an administrative search warrant. For the same reason, we need not reach Palmieri's argument that the district court improperly concluded that Stockman was entitled to discretionary act immunity. Although Palmieri's complaint presented additional claims, she does not challenge the district court's grant of summary judgment

*continued on next page...*

 

immunity for the following reasons: (1) Palmieri failed to make a substantial showing that Stockman knowingly and intentionally, or with a reckless disregard for the truth, included a false statement in the search warrant affidavit supporting the search warrant for Palmieri's residence; and (2) Palmieri failed to establish a genuine issue of material fact as to whether probable cause existed to support an administrative search warrant for her residence. Therefore, we conclude the district court appropriately granted Stockman and Clark County's motion for summary judgment. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

*Individuals significant to this case*

Respondent Dawn Stockman is a licensed veterinary technician and animal control officer for Clark County Animal Control—an agency of respondent Clark County. At the time of the events underlying this appeal, Stockman had been an animal control officer for a little more than three years. Appellant Judy Palmieri is a pet store owner and a resident of Clark County; her home was searched pursuant to a warrant obtained by Stockman. Kaitlyn Nichols is not a party to this case, but someone used her name to file a complaint against Palmieri with animal control. Prior to the events giving rise to this appeal, Nichols worked at one of Palmieri's pet stores.

---

*...continued*

with respect to those claims on appeal, and, therefore, we do not address them today. *See Powell v. Liberty Mut. Fire Ins. Co.*, 127 Nev. 156, 161 n.3, 252 P.3d 668, 672 n.3 (2011) (providing that issues not raised on appeal are deemed waived).

*The complaint and investigation*

On May 10, 2010, an animal control supervisor with the City of Las Vegas, Richard Molinari, received a complaint from a woman who identified herself as Kaitlyn Nichols (the Informant) against Palmieri for alleged animal abuse. Because Palmieri is a Clark County property owner and outside the jurisdiction of the City of Las Vegas, Molinari forwarded the Informant's complaint to Clark County Animal Control. Clark County Animal Control assigned the complaint to Stockman, who called the Informant on May 10, 2010, to discuss her complaint. During the conversation, Stockman requested that the Informant prepare a written complaint. The Informant subsequently prepared a signed written statement and faxed it to Stockman. After receiving the written statement from the Informant, Stockman called the Informant once again to confirm that she received everything that the Informant had sent.

Stockman later provided the following account of her conversation with the Informant in a search warrant affidavit:

> [Nichols] then told me that she use[d] to work for Mrs. Palmieri at Meadow[s] Pets. She was asked to help Mrs. Palmieri move some boxes at her place of residence. She arrived at [Palmieri's residence]. Once Ms. Nichols was inside the residence she saw several animals in the house. Ms. Nichols also told me there w[ere] several animals kept in the garage in kennels. The animals on the property looked very thin and several appeared to have mats and fecal [matter] all over them. Ms. Nichols said a lot of the animals appeared to be unhealthy. Ms. Nichols then went on to tell me Mrs. Palmieri breeds the

COURT OF APPEALS
OF
NEVADA

(O) 1947B

dogs and sells them at her pet shop. Ms. Nichols also stated Mrs. Palmieri also houses animals that are sick or too young for the pet shop in her house.

To corroborate the Informant's complaint, Stockman checked property records to confirm Palmieri owned the residence identified by the Informant, and she reviewed Clark County Animal Control's records for previous citations against Palmieri. The search revealed that Palmieri owned the residence identified by the Informant, Palmieri owned a pet store, Clark County Animal Control had responded to Palmieri's residence in January 2006 regarding allegations that Palmieri had a dead animal in her garage,[3] and Clark County Animal Control had received numerous health and welfare complaints regarding one of Palmieri's pet stores, Bark Avenue, including a complaint in September 2007.[4] Stockman did not

---

[3]Jason Elff, an animal control officer for Clark County Animal Control, responded to Palmieri's residence regarding the dead animal complaint. Officer Elff reported that he smelled a foul odor but could not confirm whether it was a dead animal. Palmieri would not permit Officer Elff on the property without a warrant and advised him to leave. Knowing that Palmieri previously refused to allow an animal control officer to enter her property without a warrant, Stockman elected to seek a search warrant after receiving the Informant's complaint.

[4]It is unclear from the record exactly how many citations Palmieri's pet stores have received. During her deposition, Palmieri acknowledged that in 2000 she received an 18-count indictment related to violations at one of her pet stores. Palmieri also acknowledged she received citations in December 2009 for violations at one of her pet stores; however, she alleges that the basis for the citations was false. Regarding Bark Avenue, the search warrant affidavit only details the September 2007 complaint, and the record does not indicate why Stockman did not provide details regarding the other complaints against Palmieri's businesses.

investigate the Informant's complaint further or solicit additional information from the Informant.[5]

*The warrant*

Based on the complaint and investigation, Stockman decided to seek a warrant authorizing the search of Palmieri's residence. Stockman prepared an "Administrative Search and Seizure Warrant" and an "Application and Affidavit for Administrative Search and Seizure Warrant," which included the above account of her conversation with the Informant and the corroborating information that Stockman gathered. Two of Stockman's supervisors and a deputy district attorney subsequently reviewed and approved Stockman's proposed search warrant and search warrant affidavit, and a district court judge signed the search warrant and authorized the search on May 18, 2010, after Stockman swore to the truth of the contents of the affidavit.

*The search*

Stockman executed the search warrant together with another animal control officer and an officer of the Las Vegas Metropolitan Police Department on May 19, 2010.[6] During the search, the officers found 24

---

[5]Before becoming an animal control officer and veterinary technician, Stockman worked at one of Palmieri's pet stores. As such, she had independent knowledge that Palmieri owned a pet store at one time. But Stockman did not include that information in the search warrant affidavit.

[6]The group knocked and announced at Palmieri's front door, but Palmieri did not answer. The group then walked around Palmieri's house to a garage where they knocked on the garage door and heard dogs barking. After gaining access to Palmieri's backyard, the group entered Palmieri's house and announced their presence again. Palmieri, who had
*continued on next page...*

adult dogs and 5 puppies in Palmieri's house and garage. Palmieri could not provide proof that any of the animals had received a rabies vaccination or been spayed or neutered as required by Clark County Code. The officers found that Palmieri provided the animals a sanitary environment and adequate food and water. However, because two elderly dogs looked sickly and because Palmieri could not provide proof the dogs had been to a veterinarian's office recently, the officers impounded those dogs for a welfare check by a veterinarian. The officers also impounded the five puppies because Palmieri did not have a breeding permit. As a result of the search, the officers cited Palmieri for failing to provide proof of rabies vaccination, failing to obtain a permit for intact dogs, and failing to provide proof of medical care.[7]

After the search, Palmieri questioned Stockman regarding the warrant and the Informant's complaint. In response, Stockman showed Palmieri the Informant's signed complaint, and Palmieri acknowledged that the signature on the complaint looked like Kaitlyn Nichols'

---

*...continued*

been in the shower when the officers first arrived, subsequently appeared from around the corner.

As Stockman and the other animal control officer began searching the house, the LVMPD officer instructed Palmieri to go outside where she could read the warrant. According to Palmieri, she was not permitted to enter her residence for approximately 20 to 30 minutes. During that time, Palmieri was not handcuffed, but "[she] was in [her] pajamas, had no underwear on, no makeup, [and] no shoes."

[7]The Clark County District Attorney's office subsequently brought five charges against Palmieri in Las Vegas Justice Court. For reasons that are unclear from the appendix, the justice court dismissed those charges.

signature.[8]   According to Palmieri, Stockman told her "animal control ha[d] never been able to get anything on [her] until now."[9]

*The aftermath of the search*

Approximately five months after the search of Palmieri's residence, Kaitlyn Nichols signed an affidavit averring that she never made a complaint regarding Palmieri to Clark County Animal Control or signed any such complaint.   Nichols further indicated that she had never been to Palmieri's residence and that she believed a former coworker "who ha[d] previously stolen [her] identity and forged [her] name[ ] on bank checks" was responsible for filing the complaint against Palmieri.[10]

Palmieri subsequently sued Stockman and respondent Clark County.   Palmieri's complaint included four claims for relief: (1) a 42 U.S.C. § 1983 claim against Stockman for violation of her constitutional rights under the Fourth and Fourteenth Amendments, (2) a *Monell* claim asserting § 1983 liability against Clark County, (3) a claim against Stockman encompassing several state law causes of action, and (4) a

---

[8]During her deposition, Palmieri explained that she was familiar with Nichols because Nichols worked at one of her pet stores, Frisky Pet Emporium.

[9]At her deposition, Palmieri stated she understood Stockman's statement to mean "on the very day the [breeding permit] ordinance went into effect, that they waited with a warrant till that day so that if they could find anything, they could add more charges to it, and that this way it would be their hopes of finally getting something."

[10]During her deposition, Palmieri stated that the former coworker identified by Nichols was one of Palmieri's former employees and that Nichols lived with the former coworker that she identified.

Court of Appeals
of
Nevada

(O) 1947B

separate claim against Stockman and Clark County for "illegal search and illegal warrant."

*Palmieri's deposition*

During her deposition, Palmieri acknowledged that the Clark County Code requires a homeowner to obtain a special permit or a zoning variance to possess more than 3 dogs, and she acknowledged she did not obtain such a permit or variance before housing 29 animals at her residence. Palmieri also stated that, for approximately 18 years, she had been bringing animals home from her pet stores and keeping them at her residence for short periods. Palmieri further acknowledged she had been charged numerous times for health- and welfare-related violations of the Clark County Code—both personally and through her businesses.

Although Palmieri acknowledged that Clark County was not involved with all of her previous violations, she stated that "the head of Animal Control has had [her] on his particular list for many years." According to Palmieri, she is on the head of Animal Control's list because he "doesn't like women, and . . . [he does not] like[ ] women involved in pet stores." She believes Clark County wants "to see [her] out of business. . . . [and that] the county doesn't appreciate pet stores or business—viable businesses in the county. And that's kind of their quest." Palmieri, however, explained that she did not believe Stockman was part of the conspiracy or that Stockman acted with malice against her. Instead, Palmieri suggested Stockman "came in as an officer instructed to go ahead and serve th[e] warrant and see what she could come up with." Palmieri also stated she believes Stockman actually received the complaint, but she thinks a former employee called Clark County Animal Control, pretending to be Nichols.

*Summary judgment*

After the close of discovery, Clark County and Stockman moved for summary judgment, arguing Palmieri failed to provide sufficient evidence to support her claims, and the district court granted that motion in its entirety. This appeal followed.

*ANALYSIS*

In this appeal, we primarily address whether the district court appropriately granted Stockman summary judgment on Palmieri's § 1983 claim. Palmieri contends that she established a genuine issue of material fact as to whether Stockman was entitled to qualified immunity, and, therefore, she asserts that the district court improperly granted Stockman summary judgment on her § 1983 claim. Stockman disagrees.

*Standard of review*

This court reviews a district court's decision granting or denying summary judgment de novo. *Wood v. Safeway, Inc.*, 121 Nev. 724, 729, 121 P.3d 1026, 1029 (2005). Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact remains and that the moving party is entitled to judgment as a matter of law. *Id.*; NRCP 56(c).

*Qualified immunity*

Section 1983 provides a check against the abuse of state power by creating a cause of action against state and local officials who violate an individual's federal rights while acting within the scope of their duties. *State v. Eighth Judicial Dist. Court (Anzalone)*, 118 Nev. 140, 153, 42 P.3d 233, 242 (2002). To successfully assert a claim under § 1983, the plaintiff must establish that "the conduct complained of: (1) was committed by a person acting under color of state law, and (2) deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the

United States." *Id.* at 153, 42 P.3d at 241. However, where a state or local official's discretionary act does not violate clearly established federal statutory or constitutional rights, the doctrine of qualified immunity affords that official protection from civil liability. *Butler ex rel. Biller v. Bayer*, 123 Nev. 450, 458, 168 P.3d 1055, 1061 (2007). Because qualified immunity provides "an entitlement not to stand trial or face the other burdens of litigation," courts should resolve qualified immunity defenses "at the earliest possible stage in litigation," and, therefore, "a finding of qualified immunity is an appropriate basis for granting summary judgment." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 200 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

In determining whether a government official is entitled to summary judgment based on qualified immunity, this court considers (1) whether the facts, when "[t]aken in the light most favorable to the party asserting the injury . . . show the officer's conduct violated a constitutional right," and (2) whether, at the time of the alleged violation, the right was clearly established. *Saucier*, 533 U.S. at 201; *Butler*, 123 Nev. at 458-59, 168 P.3d at 1061-62 (applying the *Saucier* test). We need not follow the rigid sequential approach set forth in *Saucier*, but rather, may determine which prong to address first based upon the specific context of the case before this court. *See Pearson*, 555 U.S. at 236. If no constitutional violation occurred, even where the facts are taken in the light most favorable to the § 1983 plaintiff, or if the constitutional right was not clearly established at the time of the alleged constitutional violation, then the defendant is entitled to qualified immunity and

summary judgment is appropriate. *Butler*, 123 Nev. at 458-59, 168 P.3d 1061-62 (citing *Saucier*, 533 U.S. at 201-02).

On appeal, Palmieri argues that Stockman was not entitled to qualified immunity because the search of her residence violated her constitutional rights under the Fourth and Fourteenth Amendments. With regard to Palmieri's argument that Stockman violated her constitutional rights, we address two issues: first, we consider whether Palmieri may challenge the validity of the search warrant based on the veracity of the search warrant affidavit under *Franks v. Delaware*, 438 U.S. 154 (1978); and second, we examine whether, even without a *Franks* violation, the search warrant affidavit was insufficient to establish probable cause. We consider each of these constitutional issues in turn.

*Franks v. Delaware and the Informant's fictitious name*

Palmieri asserts that Stockman searched her residence pursuant to an invalid search warrant because Stockman included the Informant's fictitious name in the search warrant affidavit, and thereby "knowingly and intentionally, or with reckless disregard for the truth," submitted a fictitious search warrant affidavit. By contrast, Stockman argues that she was not required to investigate the Informant's identity; that Palmieri did not raise a genuine issue of material fact as to whether Stockman knowingly and intentionally, or with reckless disregard for the truth, included a false statement in the search warrant affidavit; and that, even if the Informant's name is purged from the search warrant affidavit, it was nevertheless sufficient to establish probable cause.

*Franks*, a criminal case, is the seminal decision addressing a challenge to the validity of a search warrant based on the veracity of the supporting search warrant affidavit. In considering whether a criminal defendant may challenge the validity of the search warrant by attacking

COURT OF APPEALS
OF
NEVADA

(O) 1947B

the search warrant affidavit, the *Franks* Court confirmed that search warrant affidavits are entitled to a presumption of validity. 438 U.S. at 171. But the *Franks* Court reasoned that if search warrant affidavits were not subject to impeachment, then the probable cause requirement would be a nullity, as government officials could deliberately falsify information with impunity. *Id.* at 168. Thus, the *Franks* Court concluded an evidentiary hearing is required where (1) "the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and (2) "the allegedly false statement is necessary to the finding of probable cause." *Id.* at 155-56; *see also United States v. DeLeon*, 979 F.2d 761, 763-64 (9th Cir. 1992) (applying *Franks* to omissions of material fact). Even when a search warrant affidavit includes a false statement within the contemplation of *Franks*, an evidentiary hearing is not required if, after the false statement is purged, the search warrant affidavit remains sufficient to support a finding of probable cause. *Franks*, 438 U.S. at 171-72.

While the Nevada Supreme Court has consistently applied the standard set forth in *Franks* in the criminal context, *see, e.g., Garrettson v. State*, 114 Nev. 1064, 1068, 967 P.2d 428, 430 (1998), it has not considered the applicability of *Franks* to § 1983 claims. This court, however, can discern no reason not to apply *Franks* in the civil context; whether a criminal defendant or a civil plaintiff raises *Franks*, the conduct under attack is identical. Moreover, nearly every circuit of the federal courts of appeal has applied *Franks* in addressing defenses of qualified immunity

from civil liability.[11]   Therefore, we take this opportunity to clarify that *Franks* applies in the civil context.

In the criminal context, *Franks* issues generally arise prior to trial during suppression hearings where the trial court is necessarily the finder of fact. Because the jury is generally the finder of fact in civil cases, such as this one, we must consider what role the judge plays in resolving a *Franks* issue on summary judgment given the United States Supreme Court's qualified immunity jurisprudence and the requirement in *Franks* that the party moving for an evidentiary hearing make a substantial preliminary showing. *Franks*, 438 U.S. at 155, 170.   To resolve that question, we look to the United States Supreme Court's decision in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), and persuasive caselaw from the Ninth Circuit of the United States Court of Appeals.

To prevent excessive disruption of government and facilitate the resolution of meritless claims on summary judgment, the Supreme Court held in *Harlow* that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818.  That standard places the focus of the qualified immunity analysis

---

[11]*See, e.g., Whitlock v. Brown*, 596 F.3d 406, 410 (7th Cir. 2010); *Miller v. Prince George's Cnty.*, 475 F.3d 621, 627 (4th Cir. 2007); *Kohler v. Englade*, 470 F.3d 1104, 1113 (5th Cir. 2006); *Burke v. Town of Walpole*, 405 F.3d 66, 82 (1st Cir. 2005); *Pierce v. Gilchrist*, 359 F.3d 1279, 1293 (10th Cir. 2004); *Hunter v. Namanny*, 219 F.3d 825, 829 (8th Cir. 2000); *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997); *Kelly v. Curtis*, 21 F.3d 1544, 1554 (11th Cir. 1994); *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991); *Forster v. Cnty. of Santa Barbara*, 896 F.2d 1146, 1148 (9th Cir. 1990); *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989).

on the objective reasonableness of the government official's conduct as measured by clearly established law. *Id.* Thus, in the qualified immunity context, bare allegations of malice are insufficient "to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery." *Id.* at 817-18.

The Ninth Circuit has observed that a tension exists "between *Harlow*'s emphasis on 'objective reasonableness' and cases in which the 'clearly established law' at issue contains a subjective element, such as motive or intent." *Branch v. Tunnell*, 937 F.2d 1382, 1385 (9th Cir. 1991), *overruled on other grounds by Galbraith v. Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). Based on that tension, the Ninth Circuit has adopted a standard for overcoming summary judgment that parallels the threshold showing that a criminal defendant must make to establish entitlement to a *Franks* hearing. *Hervey v. Estes*, 65 F.3d 784, 788-89 (9th Cir. 1995). Specifically, the Ninth Circuit concluded that

> a plaintiff can only survive summary judgment on a defense claim of qualified immunity if the plaintiff can *both* establish a substantial showing of a deliberate falsehood or reckless disregard and establish that, without the dishonestly included or omitted information, the magistrate would not have issued the warrant.

*Id.* at 789. If a § 1983 plaintiff both makes the requisite substantial showing and establishes that the issuing court would not have issued the warrant without the false information, then, and only then, does the question of whether the government official's conduct was intentional or reckless become a factual determination for the jury. *Id.* We find the Ninth Circuit's reasoning in *Branch* and *Hervey* persuasive, and, therefore, we adopt *Hervey*'s standard for deciding *Franks* claims in the summary judgment context. We address each prong in turn below.

*Deliberate falsehood or reckless disregard*

The evidence here does not support the proposition that Stockman made a knowing and intentional false statement in her affidavit. To the contrary, Palmieri conceded in her deposition that Stockman did not harbor malice against her, that Stockman actually received the complaint, and that Stockman was merely doing her job in serving the search warrant. Nevertheless, the question of whether Stockman showed reckless disregard for the truth still requires analysis and elaboration.

Reckless disregard for the truth may be shown by establishing that the warrant affiant entertained serious doubts with regard to the truth of the search warrant affidavit's allegations. *United States v. Williams*, 737 F.2d 594, 602 (7th Cir. 1984) (citing *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)) (concluding that the First Amendment definition of reckless disregard for the truth is applicable in the *Franks* context). A party attacking the veracity of a search warrant affidavit may also establish reckless disregard for the truth inferentially "from circumstances evincing 'obvious reasons to doubt the veracity' of the allegations" in the search warrant affidavit. *Id.* (quoting *St. Amant*, 390 U.S. at 732).

Under *Franks*, conclusory assertions and allegations of negligence or innocent mistake are insufficient to warrant an evidentiary hearing. 438 U.S. at 171. And a criminal defendant seeking to attack a search warrant affidavit cannot rely on the false statements of *any nongovernmental informant* but, rather, must limit his or her challenge to the deliberate falsity or reckless disregard of the *affiant*. *Id.* ("The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant.").

Court of Appeals
of
Nevada

(O) 1947B

Here, in support of her challenge to the veracity of the search warrant affidavit, Palmieri provided an affidavit from Nichols in which Nichols averred that she never made or signed a complaint against Palmieri, she had never been to Palmieri's residence, and she believed a former coworker was responsible for filing the complaint. For purposes of summary judgment, we view the facts in the light most favorable to Palmieri and assume the Informant provided Stockman a false name— Kaitlyn Nichols. *See Wood v. Safeway, Inc.*, 121 Nev. 724, 729, 121 P.3d 1026, 1029 (2005); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001) (providing that courts must consider the facts in the light most favorable to the party asserting that his or her constitutional rights were violated when considering whether to grant summary judgment based on qualified immunity), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009). But, although Stockman included the Informant's fictitious name in the search warrant affidavit, the alleged falsehood is attributable to the Informant, rather than Stockman, and Palmieri cannot use *Franks* to impeach the Informant. *See Franks*, 438 U.S. at 171 (explaining that a challenge to a search warrant affidavit may not be based on a nongovernmental informant's deliberate falsehood or reckless disregard).

Palmieri's only direct allegation relevant to whether Stockman recklessly disregarded the truth is that Stockman should have known that the Informant provided a false identity. That allegation assumes that an officer has a duty to investigate and confirm an informant's identity prior to obtaining a search warrant based on an informant's tip. But Palmieri did not present, and our research has not revealed, any legal authority to support that assumption. To the contrary, the United States Supreme

Court has considered whether officers may rely on tips from anonymous informants and concluded that a tip from an anonymous informant can form at least part of the basis for reasonable suspicion or even probable cause. *See Alabama v. White*, 496 U.S. 325 (1990) (discussing an anonymous tip in the reasonable suspicion context); *see also Illinois v. Gates*, 462 U.S. 213 (1983) (considering an anonymous tip in the probable cause context).

Because the anonymity of an informant affects the weight of the various indicia of reliability accompanying the informant's tip, *see Gates*, 462 U.S. at 237, the real issue in the present case is whether the Informant is properly classified as an anonymous informant or an identified citizen informant for purposes of assessing the reasonableness of the search warrant. And, as discussed more below, where a citizen informant provides a tip via telephone and states his or her occupation or name and home and cellular telephone numbers, courts have found that such information is sufficient to categorize the informant as an identified citizen informant whose tip should be credited with a greater degree of reliability than that of an anonymous informant. *See, e.g., Maumee v. Weisner*, 720 N.E.2d 507 (Ohio 1999) (cataloging relevant cases, rejecting an argument that an informant who provided a tip via telephone may have provided a false identity, and concluding that the informant, who provided a name and home and cellular telephone numbers, was an identified citizen informant whose tip should be recognized as more reliable than that of an anonymous informant).

The evidentiary basis for Palmieri's argument is also lacking. Palmieri presented no evidence to suggest that Stockman knew the Informant provided a false identity or entertained serious doubts as to the

Informant's identity. *See Williams*, 737 F.2d at 602 (concluding that reckless disregard for the truth may be established through evidence establishing that the warrant affiant entertained cast serious doubts regarding the allegations in the search warrant affidavit). Nor did she present evidence from which a fact-finder could infer an obvious reason to doubt the veracity of the allegations in the search warrant affidavit. *Id.* (holding that reckless disregard for the truth may be proven inferentially through evidence establishing an obvious reason to doubt the allegations in the search warrant affidavit). By contrast, Stockman testified that she believed and continues to believe that Nichols was the Informant, and Palmieri did not dispute that testimony. Palmieri, therefore, did not make the substantial preliminary showing necessary to survive a motion for summary judgment based on qualified immunity.

In reality, Palmieri's allegation assumes that Stockman should have known or suspected that the Informant provided a false identity without providing a basis for that assumption, and, therefore, her assertion amounts to a conclusory allegation of negligence, and such an allegation does not constitute a substantial showing that Stockman acted with a reckless disregard for the truth when she included the Informant's false name in the search warrant affidavit. *See Franks*, 438 U.S. at 171 (explaining that conclusory allegations and allegations of negligence are insufficient to warrant an evidentiary hearing); *see also Hervey*, 65 F.3d at 789 (explaining that a plaintiff must make the same showing to reach a jury in a § 1983 action as would be required of a criminal defendant to obtain an evidentiary hearing under *Franks*). As Palmieri's offer of proof is insufficient to satisfy the first prong of *Franks*, we conclude she cannot

challenge the search warrant based on the search warrant affidavit's veracity.

Because Palmieri failed to demonstrate that Stockman included the Informant's fictitious name in the search warrant affidavit with a reckless disregard for the truth, we need not proceed to the second prong of *Franks*. *See Hervey*, 65 F.3d at 788-89 (providing that to survive summary judgment on a *Franks* issue, a plaintiff must make a substantial showing of a deliberate falsehood or reckless disregard for the truth and establish that the search warrant affidavit was insufficient to establish probable cause without the false information). But because Palmieri raises a number of issues regarding the sufficiency of the search warrant and because all of Palmieri's arguments regarding the district court's grant of summary judgment turn on probable cause, we proceed to consider whether the search warrant affidavit established probable cause to search Palmieri's residence such that Stockman is entitled to qualified immunity under *Saucier*. In considering whether the search warrant was supported by probable cause, we review the issuing court's probable cause determination based on the search warrant affidavit as written, given Palmieri's failure to make the requisite substantial preliminary showing sufficient to overcome summary judgment with regard to her *Franks* argument. *See Franks*, 438 U.S. at 171-72 (providing that where a party satisfies the *Franks* test, the reviewing court must purge the false statements from the search warrant affidavit and assess probable cause based on the modified affidavit).

*Probable cause*

Palmieri contends the judge who issued the "Administrative Search and Seizure Warrant" lacked an adequate basis for doing so because Stockman did not investigate the Informant's identity, and,

COURT OF APPEALS
OF
NEVADA

(O) 1947B

therefore, the "Application and Affidavit for Administrative Search and Seizure Warrant" provided no indicia of the Informant's reliability. She further complains that the search warrant affidavit contains no indication that Stockman corroborated the Informant's complaint.[12] Stockman, on the other hand, argues probable cause existed because she received specific, credible information indicating that animals on Palmieri's property were kept in a condition that jeopardized their health and welfare, and because she corroborated the identity and residence of the alleged wrongdoer.

In evaluating an issuing court's decision to issue a search warrant, we do not conduct a de novo review; instead, we consider whether the evidence, taken together, demonstrated a substantial basis for the issuing court's probable cause determination. *Keesee v. State*, 110 Nev. 997, 1002, 879 P.2d 63, 67 (1994); *see also West Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 959 (11th Cir. 1982) (explaining that for both administrative and criminal search warrants, appellate courts apply the same standard of review). And we are mindful that "[a] grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting." *United States v. Ventresca*, 380 U.S. 102, 108 (1965). Nevertheless, we review a district court's legal conclusions regarding a

---

[12]We have considered Palmieri's remaining arguments with regard to whether the search warrant was supported by probable cause, and, for the reasons discussed below, we conclude that under the totality of the circumstances, the search warrant was supported by administrative probable cause.

search's constitutionality de novo. *State v. Lloyd*, 129 Nev. ___, ___, 312 P.3d 467, 469 (2013).

The Fourth Amendment to the United States Constitution and Article 1, Section 18 of the Nevada Constitution prohibit unreasonable searches and seizures. Probable cause is the standard by which a search's reasonableness is tested, and the type of probable cause necessary to support a search warrant differs depending on the objective of the search.[13] *See Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320 (1978); *Camara v. Mun. Court*, 387 U.S. 523, 534 (1967). As relevant to this case, criminal search warrants require a stronger showing of probable cause, whereas administrative search warrants generally are supportable by a lesser showing of probable cause. *E.g.*, *Marshall*, 436 U.S. at 320 (holding that "[p]robable cause in the criminal law sense is not required" to support an administrative search warrant); *see also Michigan v. Clifford*, 464 U.S. 287 (1984) (discussing administrative probable cause in the context of a search of a private residence).

The search warrant here is entitled "Administrative Search and Seizure Warrant," but the title affixed to a search warrant is not

---

[13]We are cognizant that a warrant or probable cause is not the sole measure of reasonableness where such requirements would undermine the governmental purpose underlying the search. *E.Z. v. Coler*, 603 F. Supp. 1546, 1558 (N.D. Ill. 1985), *aff'd sub nom. Darryl H. v. Coler*, 801 F.2d 893 (7th Cir. 1986). For example, in child welfare law, it has been recognized that the fastest way to verify an allegation of abuse or neglect is to access the home and observe the child, and that to require officials to corroborate allegations through independent sources prior to executing a search warrant may not only be impractical, but may unnecessarily delay examination of a child's situation, possibly resulting in harm or death to the child. *Id.* at 1558-59.

determinative of the legal standard by which its reasonableness is assessed. *See Clifford*, 464 U.S. at 294 (providing that the objective of the search determines whether an administrative or a criminal warrant is required). As a preliminary matter, therefore, we consider whether the search warrant in the present case is properly classified as an administrative or a criminal search warrant.[14]

Generally, an administrative warrant is a warrant issued by a judge authorizing an administrative agency to conduct a search "to determine whether physical conditions exist which do not comply with minimum standards prescribed in local regulatory ordinances." *See Camara*, 387 U.S. at 530 (discussing administrative searches in the

---

[14]Clark County did not argue before the district court that the search warrant was supported by administrative probable cause, and on appeal, it did not raise the issue in its opening or reply briefs. As a general rule, issues not raised before the district court or in the appellant's opening brief on appeal are deemed waived. *See Old Aztec Mine, Inc. v. Brown*, 97 Nev. 49, 52, 623 P.2d 981, 983 (1981) ("A point not urged in the trial court, unless it goes to the jurisdiction of that court, is deemed to have been waived and will not be considered on appeal."); *see also Powell v. Liberty Mut. Fire Ins. Co.*, 127 Nev. 156, 161 n.3, 252 P.3d 668, 672 n.3 (2011) (explaining that issues not raised on appeal are deemed waived). But this court has discretion to consider issues of constitutional dimension sua sponte notwithstanding the parties' failure to raise such issues before the district court or on appeal. *See Desert Chrysler-Plymouth, Inc. v. Chrysler Corp.*, 95 Nev. 640, 643-44, 600 P.2d 1189, 1191 (1979) (providing that an appellate court may raise constitutional issues sua sponte on appeal).

During oral argument, this court raised the issue of administrative probable cause and permitted the parties an opportunity to discuss that issue. Because the issue of whether administrative probable cause supported the search warrant presents an important constitutional question, we have determined to address it sua sponte. *See id.*

COURT OF APPEALS
OF
NEVADA

(O) 1947B

context of a constitutional challenge to a warrantless administrative search); *see also Administrative Warrant, Black's Law Dictionary* (10th ed. 2014) ("A warrant issued by a judge at the request of an administrative agency that seeks to conduct an administrative search."), *and Administrative Search, Black's Law Dictionary* (10th ed. 2014) ("The inspection of a facility by one or more officials of an agency with jurisdiction over the facility's fire, health, or safety standards."). Unlike a criminal search warrant that authorizes a search for evidence of criminal conduct, an administrative search warrant merely authorizes a routine inspection for regulatory compliance. *See Camara*, 387 U.S. at 530. Because an administrative search warrant only authorizes "a routine inspection of the physical condition of private property," an inspection pursuant to such a warrant "is a less hostile intrusion than the typical policeman's search for the fruits and instrumentalities of crime." *Id.*

Where a warrant is required to conduct a search, the objective of the search determines whether an administrative or a criminal warrant is required. *Clifford*, 464 U.S. at 294. If the primary objective of a search is to gather evidence of criminal conduct, then a criminal search warrant is required. *Id.* On the other hand, an administrative search warrant is required where the primary objective of the search is to ascertain compliance with the minimum standards set forth in regulatory ordinances. *See id.*; *see also Camara*, 387 U.S. at 530. The United States Supreme Court, however, has acknowledged that, notwithstanding the underlying objective of an administrative search warrant, discovery of a

regulatory violation during an administrative search may lead to criminal penalties.[15] Specifically, the Supreme Court has observed:

> Like most regulatory laws, fire, health, and housing codes are enforced by criminal processes. In some cities, discovery of a violation by the inspector leads to a criminal complaint. Even in cities where discovery of a violation produces only an administrative compliance order, refusal to comply is a criminal offense, and the fact of compliance is verified by a second inspection, again without a warrant. Finally, as this case demonstrates, refusal to permit an inspection is itself a crime, punishable by fine or even by jail sentence.

*Camara*, 387 U.S. at 531 (footnotes omitted); *see also Bd. of Cnty. Comm'rs v. Grant*, 954 P.2d 695, 701 (Kan. 1998) (concluding that a potential "criminal penalt[y] is not a constitutional obstacle to obtaining an administrative search warrant for routine inspections").

Title 10 of the Clark County Code governs the care and control of animals in Clark County. As relevant to this appeal, Title 10 sets forth standards to protect the health and welfare of animals in Clark County—for example, it includes numerous provisions prohibiting various forms of animal cruelty. Clark County Code §§ 10.32.010-10.32.250 (2010). To ensure compliance with the regulatory framework, Title 10 authorizes searches of

---

[15]During a valid administrative search, authorities may seize evidence of criminal conduct in plain view. *Clifford*, 464 U.S. at 294. Authorities may not use that evidence as a justification to expand the scope of the initial administrative search, but they may use evidence seized under the plain-view doctrine to obtain a criminal search warrant. *Id.*

private property. Specifically, Clark County Code § 10.24.060 *(2010)* provides as follows:

> The animal control officer and any police officer in the county while on duty, for just cause, shall have the right to enter upon private property or public property in the county in order to examine or capture any animal thereon or therein; provided, however, that no such officer or employee shall have the right to enter a house or structure which is in use as a residence without having first secured a search warrant. *(2012)*

And Clark County Code § 10.40.040(b) provides that persons who violate Title 10 are subject to civil or criminal penalties.

In the present case, Stockman obtained a warrant to search Palmieri's residence, as authorized by Clark County Code § 10.24.060. The warrant was entitled "Administrative Search and Seizure Warrant." Consistent with its title, the search warrant did not authorize a search of Palmieri's private property to uncover evidence of criminal conduct, but rather, instructed officers to ascertain the condition of the animals on Palmieri's property. Specifically, the search warrant instructed officers to determine whether the animals on Palmieri's property were unhealthy, held in violation of Clark County Code Title 10, or kept in a cruel condition. And if officers determined that any animals on Palmieri's property were unhealthy or kept in a cruel condition, the search warrant authorized the officers to seize and hold such animals until their release was ordered by the district court or until Palmieri complied with conditions set forth by the officers. If determined necessary by a veterinarian, the search warrant also provided for the immediate euthanasia of any animals seized.

Although a person who commits animal cruelty or otherwise violates Clark County Code Title 10 may be subject to criminal penalties, *see* NRS 574.100, the primary objective of the search of Palmieri's property, as demonstrated by the warrant authorizing the search, was to protect the health and welfare of Palmieri's animals. As the primary objective of the search warrant in the present case was to protect the health and welfare of animals on Palmieri's property, we conclude the search warrant constituted an administrative search warrant. And given our conclusion that the search warrant constituted an administrative search warrant, we next consider whether probable cause existed to support an administrative search warrant.

The probable cause requirement as applied to administrative search warrants was first discussed by the United States Supreme Court in *Camara*. There, the Court noted that where an administrative search is undertaken pursuant to a neutral inspection scheme, the heightened showing of probable cause required for a criminal search is impractical and unnecessary because many violations could not be corroborated absent a search and because the privacy invasion associated with an administrative search is limited. *Camara*, 387 U.S. at 537.

Since *Camara*, the Supreme Court has determined that probable cause to support an administrative search warrant may be based either on a neutral inspection scheme or on specific evidence of a violation. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320 (1978). And, interpreting *Marshall*, lower courts have held that, even where an administrative search arises from specific evidence of a violation, rather than as part of a

neutral inspection scheme, traditional criminal probable cause is not required.[16]

For example, in *Commonwealth v. DeLuca*, the court upheld an administrative search warrant allowing officials to search a home for code violations regarding the home's condition and habitability. 6 Pa. D. & C. 5th 306, 324-25 (Pa. Ct. C.P., Del. Cnty. 2008). There, probable cause sufficient to support the warrant existed based upon the specific allegations regarding the property's condition, the property's history of similar complaints, and officials' observations of trash and graffiti outside and in the home. *Id.* at 310, 326. The court observed "that an administrative search warrant does not require as high a level of probable cause as a criminal search warrant." *Id.* at 323. It further noted the search was driven by public health and welfare considerations, and the defendants' invasion of privacy was negligible when balanced with the city's need to inspect the property. *Id.* at 325-26.

Although an administrative search warrant based on specific evidence of a violation does not require criminal probable cause, that proposition does not provide guidance as to the quantum of specific evidence necessary to establish administrative probable cause. In *West Point-Pepperell, Inc. v. Donovan*, the United States Court of Appeals for the Eleventh Circuit considered the showing necessary to establish administrative probable cause. 689 F.2d 950, 957-58 (11th Cir. 1982).

---

[16]*See, e.g., In re Establishment Inspection of Gilbert & Bennett Mfg. Co.*, 589 F.2d 1335, 1339 (7th Cir. 1979); *In re Alameda Cnty. Assessor's Parcel Nos. 537-801-2-4 & 537-850-9*, 672 F. Supp. 1278, 1287 (N.D. Cal. 1987); *Pieper v. United States*, 460 F. Supp. 94, 97-98 (D. Minn. 1978), *aff'd* 604 F.2d 1131 (8th Cir. 1979); *In re Inspection of Titan Tire*, 637 N.W.2d 115, 123 (Iowa 2001).



There, the Eleventh Circuit reasoned that even though a lesser showing of probable cause is required for an administrative search warrant given the limited intrusion associated with an administrative search, the administrative search warrant must still satisfy the Fourth Amendment's basic purpose, "which is 'to safeguard the privacy and security of individuals against arbitrary invasions by government officials.'" *Id.* at 958 (quoting *Marshall*, 436 U.S. at 312).

To satisfy that requirement, the Eleventh Circuit observed that an administrative search must not subject individuals "to the unbridled discretion of 'executive and administrative officers, particularly those in the field, as to when to search and whom to search.'" *Id.* (quoting *Marshall*, 436 U.S. at 323). Thus, the Eleventh Circuit concluded that administrative probable cause may be found where "the proposed inspection is based upon a reasonable belief that a violation has been or is being committed" and that the belief is supported "by a showing of specific evidence sufficient to support a reasonable suspicion of a violation." *Id.* We agree with the Eleventh Circuit's rationale in *Donovan* and conclude that to establish administrative probable cause based on evidence of a specific violation, a search warrant affidavit must show specific evidence sufficient to support a reasonable suspicion of a violation.

To determine whether reasonable suspicion exists, courts look to the totality of the circumstances. *Alabama v. White*, 496 U.S. 325, 330-31 (1990) (applying the totality of the circumstances test to determine whether an anonymous informant's tip established reasonable suspicion to justify an investigatory stop); *see also State v. Rincon*, 122 Nev. 1170, 1173-74 (2006) (explaining that to assess whether an investigatory stop was supported by reasonable suspicion, courts look to the totality of the

circumstances). In considering the totality of the circumstances, we analyze both the "content of information possessed by police and its degree of reliability." *White*, 496 U.S. at 330 (comparing quanta of proof required for reasonable suspicion and probable cause analyses). But, in comparison to criminal probable cause, reasonable suspicion is a less demanding standard because it does not require information possessing the same quality or content as criminal probable cause, and because it can be established with information that is less reliable than that required to demonstrate criminal probable cause. *Id.*

In the present case, we consider whether the Informant's tip, as corroborated, exhibited sufficient indicia of reliability to support reasonable suspicion for a search warrant for Palmieri's residence. *See Jones v. United States*, 362 U.S. 257, 269 (1960) (concluding hearsay may support a search warrant "so long as a substantial basis for crediting the hearsay is presented"), *overruled on other grounds by United States v. Salvucci*, 448 U.S. 83 (1980). Because the totality of the circumstances approach is concerned with the quantity and quality of information, a tip that has a relatively high degree of reliability will require less corroborating information to establish the requisite quantum of administrative probable cause. *See White*, 496 U.S at 330. In considering the reliability of an informant's tip, numerous federal and state courts have determined that a tip from an *identified* citizen informant is presumably reliable because an identified citizen that witnesses and reports a crime has no apparent motive to falsify information.[17]

---

[17]*See Fabrikant v. French*, 691 F.3d 193, 216 (2d Cir. 2012) (reasoning that "information provided by an identified bystander with no apparent motive to falsify has a peculiar likelihood of accuracy, and . . . an

*continued on next page...*

When categorizing informants as anonymous or identified, courts are flexible in assessing the type and amount of information necessary to identify an informant. *See City of Maumee v. Weisner*, 720 N.E.2d 507, 514 (Ohio 1999) (considering whether an identified informant's tip established reasonable suspicion). For example, in *Weisner*, the Supreme Court of Ohio considered whether an informant who provided a tip via telephone would be considered identified for the purpose of assessing the informant's credibility. *Id.* at 509, 513. There, the informant called 9-1-1 to report a suspected drunk driver. *Id.* at 509. During the call, the informant provided the dispatcher with his name and

---

*...continued*

identified citizen informant is presumed to be reliable") (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)); *Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir. 2009) (concluding an identified witness "was a citizen witness, not an informant, and such witnesses are generally presumed reliable"); *United States v. Martinelli*, 454 F.3d 1300, 1307 (11th Cir. 2006) (observing that "[t]he courts have traditionally viewed information drawn from an ordinary witness or crime victim with considerably less skepticism than information derived from anonymous sources"); *Edwards v. Cabrera*, 58 F.3d 290, 294 (7th Cir. 1995) (noting that an identifiable "citizen informant is inherently more reliable than the usual police informants who are often mired in some criminal activity themselves"); *United States v. Pasquarille*, 20 F.3d 682, 689 (6th Cir. 1994) (holding that a citizen informant's tip was presumptively reliable because the citizen informant was an identified eyewitness to the alleged crime); *Easton v. City of Boulder*, 776 F.2d 1441, 1449 (10th Cir. 1985) (noting "the skepticism and careful scrutiny usually found in cases involving informants, sometimes anonymous, from the criminal milieu, is appropriately relaxed if the informant is an identified victim or ordinary citizen witness"); *United States v. Philips*, 727 F.2d 392, 397 (5th Cir. 1984) (concluding that "[w]hen information is received from an identified bystander or victim-eyewitness to a crime, . . . reliability need not be established in the officer's affidavit") (internal quotation marks omitted).

COURT OF APPEALS
OF
NEVADA

(O) 1947B

cellular and home telephone numbers, and he remained on the telephone with the dispatcher to assist the responding officer in locating the suspected drunk driver. *Id.* Based on those facts, the *Weisner* court specifically rejected the suspected drunk driver's contention that the informant was anonymous because the informant may have fabricated his identity. *Id.* at 514. Instead, the court concluded that the informant was sufficiently identified to warrant recognizing the informant's tip as more reliable than that of an anonymous informant, noting that it was undisputed that the informant provided his name and cellular and home telephone numbers. *Id.* The *Weisner* court also reasoned that, because the informant maintained continuous contact with the dispatcher during the reported incident, he considered face-to-face contact a possibility and was unlikely to falsify a report given the potential repercussions. *Id.*

And *Weisner* is not the only case in which courts have been flexible with regard to the type and amount of information necessary to categorize an informant as identified. In *United States v. Pasquarille*, 20 F.3d 682, 683, 687 (6th Cir. 1994), the court categorized an informant as an identified citizen informant where the informant did not provide his name, but rather identified himself as a transporter of prisoners. Similarly, in *Edwards v. Cabrera*, 58 F.3d 290, 294 (7th Cir. 1995), the court treated an unnamed informant as an identified citizen informant where the police were aware the informant was a bus driver.

Here, Palmieri argues the Informant was anonymous and the information was, therefore, unreliable. We disagree. As reported to the issuing judge, the Informant initially contacted Richard Molinari, an animal control supervisor with the City of Las Vegas, to file a complaint and provided the name Kaitlyn Nichols. After Molinari forwarded the

COURT OF APPEALS
OF
NEVADA

(O) 1947B

complaint to Clark County Animal Control, Stockman spoke with the Informant by phone, and the Informant again provided the name Kaitlyn Nichols.[18] Based on the sequence of events reported by Stockman, which Palmieri does not dispute, the issuing judge could have inferred that the Informant provided a telephone number at which Clark County Animal Control could reach the Informant. And, similar to *Weisner*, the issuing judge could have inferred that the Informant's continued participation in the reporting process suggested that the Informant considered the possibility of face-to-face contact and was unlikely to fabricate a report given the potential consequences. Arguably, the information the Informant provided could have subjected the Informant to prosecution for perjury, a category D felony under NRS 199.130, for "caus[ing] to be made, executed or signed, any false or fictitious affidavit . . . for the purpose of securing a warrant for the searching of the premises . . . of any other person." As such, the Informant provided Stockman the type and amount of information needed to identify the Informant, and Stockman provided that information to the issuing judge in the search warrant affidavit.

We are mindful, of course, of the requirement that this court must consider "the evidence, and any reasonable inferences drawn from it . . . in a light most favorable to the nonmoving party." *Wood v. Safeway, Inc.*, 121 Nev. 724, 729, 121 P.3d 1026, 1029 (2005). Accordingly, we assume that the Informant, in identifying herself as Kaitlyn Nichols, provided Stockman a false name. But the reasonableness of a search

---

[18]Notably, Palmieri acknowledged that she believes that Stockman received the tip from an informant who identified herself as Kaitlyn Nichols. And Palmieri acknowledged that the signature on Stockman's complaint appeared to be Kaitlyn Nichols' signature.

warrant is not assessed based on information acquired subsequent to a search, but rather, must be considered based on information provided to the magistrate in the search warrant affidavit. *Maryland v. Garrison*, 480 U.S. 79, 85 (1987). As discussed above, Palmieri did not establish a genuine issue of material fact with regard to whether Stockman knew or should have known that the Informant provided a false identity. As known at the time of issuance of the search warrant, the Informant was identified, and, therefore, we conclude her tip, at the time, was entitled to a presumption of reliability.

Our categorization of the Informant as an identified citizen informant is not the only basis for concluding that her tip, as perceived by Stockman and the issuing judge, demonstrated significant indicia of reliability. Where an informant's tip is based on personal knowledge, and includes an explicit, detailed description of alleged criminal activity, the informant's tip is entitled to greater weight than the weight accorded to a secondhand description. *Illinois v. Gates*, 462 U.S. 213, 234 (1983). In the present case, the Informant indicated that she observed violations of the Clark County Code in Palmieri's residence firsthand, and she provided a detailed description of those violations, reporting that she saw several animals in Palmieri's house and garage, that the animals looked unhealthy and thin and appeared to have matted fur and fecal matter all over them, and that Palmieri keeps animals at her house that are too sick or young to be housed at her pet store.[19] Because the Informant's tip was detailed and based on firsthand observation and because the Informant's

___

[19]We note that Palmieri does not argue that Stockman did not accurately describe the substance of the Informant's report in the search warrant affidavit.

COURT OF APPEALS
OF
NEVADA

(O) 1947B

reported relationship to Palmieri provided an objectively reasonable explanation for the Informant's opportunity to observe those violations, we conclude that the basis of the Informant's knowledge provides additional support for the Informant's presumed reliability. Moreover, the Informant's allegations did not relate to an isolated incident, but rather, to unhealthy conditions that develop over a lengthy period of time. Thus, the Informant's allegations provided reason to believe that there was an ongoing violation of Clark County's standards for the health and welfare of animals in Palmieri's residence.

And Stockman did not merely rely on the Informant's complaint; she also corroborated the Informant's report by verifying that Palmieri owned the reported residence and reviewing records that revealed Clark County Animal Control had previously received health and welfare complaints regarding Palmieri's residence and businesses. Neither before the district court nor before this court has Palmieri suggested that Stockman did not actually verify this information, which Stockman stated she verified in the search warrant affidavit.

Given the foregoing, we conclude that the Informant's specific, detailed allegations regarding ongoing animal cruelty in Palmieri's residence, combined with the Informant's reliability and basis of knowledge and the corroborating information gathered by Stockman were sufficient to support a reasonable suspicion that Palmieri was endangering the health and welfare of animals on her property.[20] We

---

[20]The actual scope of the search and the results of the search do not affect our probable cause determination, *Maryland v. Garrison*, 480 U.S. 79, 85 (1987) ("The validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and

*continued on next page...*

reiterate that our review of the issuing court's probable cause determination is not de novo, but rather, is limited to an evaluation of whether the evidence as a whole, including the Informant's presumed reliability, the Informant's personal knowledge and detailed description of violations, and the corroborating information provided by Stockman,

---

*...continued*

to disclose, to the issuing Magistrate."). However, we note that Stockman and the accompanying animal control officer limited the scope of their search as required by the administrative search warrant, and that the search revealed that (1) Palmieri kept 29 dogs in her house and garage, (2) two dogs appeared sickly, (3) Palmieri could not provide proof that the dogs received rabies vaccinations, and (4) Palmieri did not have a permit to possess intact dogs.

We are cognizant that the search was an unpleasant experience for Palmieri. But the search did not exceed the limited scope of the administrative search warrant. Moreover, it only took the officers one to one-and-a-half hours to search Palmieri's residence, to observe 29 dogs, to request that Palmieri provide the relevant paperwork, and to remove 7 dogs from Palmieri's residence. Although Palmieri was not detained based on suspicion of criminal behavior, we note that the 20 to 30 minute period during which Palmieri was removed from her residence, but not restrained, was well within the one-hour limit for temporary detentions. *See* NRS 171.123(4) ("A person must not be detained longer than is reasonably necessary to effect the purposes of this section, and in no event longer than 60 minutes.").

We also note that the manner of the search in the present case did not approach the intrusiveness of the methods frequently used for searches related to criminal conduct. *See, e.g., Muehler v. Mena*, 544 U.S. 93, 95-96, 100, 102 (2005) (upholding a search of a residence where a Special Weapons and Tactics team was used to secure a residence that was subject to a search warrant, and the inhabitants of the residence were handcuffed and detained in a garage for two to three hours during the ensuing search). In perspective, the invasion of Palmieri's privacy interest was low compared to the regulatory need to ensure code compliance and protect the health and welfare of the many dogs on Palmieri's property.

provided a substantial basis to conclude administrative probable cause existed to search Palmieri's residence. *Keesee v. State*, 110 Nev. 997, 1002, 879 P.2d 63, 67 (1994). Our holding today simply recognizes that under these facts, the totality of the circumstances supported a finding of administrative probable cause to believe there was evidence in Palmieri's residence of animal cruelty or a violation of Clark County's codes for the health and welfare of animals.[21] *See Alabama v. White*, 496 U.S. 325, 330-

---

[21]The concurrence questions whether the Nevada Supreme Court's decision in *Owens v. City of North Las Vegas*, 85 Nev. 105, 450 P.2d 784 (1969), imposed a requirement that officers must first seek permission to enter a property before obtaining an administrative search warrant. In *Owens*, the supreme court relied on the United States Supreme Court's decision in *Camara v. Municipal Court*, 387 U.S. 523 (1967), to resolve a challenge to the validity of an administrative search warrant. There, the *Owens* Court suggested that, as a practical matter, officers should seek permission to inspect a property before turning to the warrant process. But, the language used by the *Owens* Court closely follows the United States Supreme Court's decision in *Camara*. *Compare Owens*, 85 Nev. at 111, 450 P.2d at 787-88 ("As a practical matter, in view of the Fourth Amendment's requirement that a warrant describe the property to be searched, warrants should normally be sought only after the entry has been refused, absent some compelling reason for securing immediate entry."), *with Camara*, 387 U.S. at 539-40 ("[A]s a practical matter and in light of the Fourth Amendment's requirement that a warrant specify the property to be searched, it seems likely that warrants should normally be sought only after entry is refused unless there has been a citizen complaint or there is other satisfactory reason for securing immediate entry."). We are not aware of any legal authority interpreting *Camara* to require that an officer must request permission to enter a property before seeking a search warrant, *cf. Ciarlone v. City of Reading*, 489 F. App'x 567, 571-72 (3d Cir. 2012) (rejecting an argument that, under *Camara*, an opportunity to consent must be provided before officers may seek a search warrant), and we do not read *Owens*, which relied on *Camara*, to impose such a requirement in Nevada.

*continued on next page...*

COURT OF APPEALS
OF
NEVADA

(O) 1947B

31 (1990); *see also West Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 958 (11th Cir. 1982) (providing that administrative probable cause may be established with evidence sufficient to support a reasonable suspicion of a violation). Consequently, Palmieri failed to demonstrate a genuine issue of material fact as to whether Stockman violated her clearly established constitutional rights.[22] *See Mullenix v. Luna*, 577 U.S. ___, 136 S. Ct. 305, 308 (2015) ("The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established

---

*...continued*

Moreover, even if *Owens* imposed such a requirement, Stockman specifically averred in the search warrant affidavit that, during a prior animal-welfare investigation, Palmieri refused to consent to a search of her residence and demanded that a Clark County Animal Control officer leave her property until such time as he obtained a search warrant. Based on that information, the issuing judge could have reasonably concluded that efforts to procure a consensual search of Palmieri's residence would have been fruitless. And, although she did not elaborate further in her search warrant affidavit, we note that Stockman later testified in her deposition that she sought a search warrant after receiving the Informant's complaint due to Palmieri's previous refusal to consent to a search of her residence.

[22]Notwithstanding our conclusion, we are aware that Stockman could have done more to corroborate the information provided by the Informant—for example, Stockman could have observed Palmieri's residence in person and listened for barking dogs. Simply stated, Stockman's search warrant affidavit does not evince a model of investigative work. That Stockman could have done more, however, does not necessarily mean that the search warrant was invalid. While this is a close case, we are satisfied that, under the facts of this case, administrative probable cause existed to search Palmieri's residence for evidence of animal cruelty or a violation of Clark County's codes for the health and welfare of animals.

statutory or constitutional rights of which a reasonable person would have known." (internal quotation marks omitted)).

## CONCLUSION

Palmieri failed to make a substantial showing that Stockman knowingly and intentionally, or with a reckless disregard for the truth, included a false statement in the administrative search warrant affidavit, and Palmieri failed to establish a genuine issue of material fact with regard to whether the administrative search warrant was supported by probable cause to search Palmieri's residence.[23] Because Palmieri failed to establish that Stockman violated her constitutional rights, Stockman is entitled to qualified immunity, *see Butler*, 123 Nev. at 458-59, 168 P.3d 1061-62, and, therefore, we conclude the district court did not err by granting Stockman's summary judgment on Palmieri's § 1983 claim. And, as previously discussed, absent a violation of Palmieri's constitutional rights by Stockman, Palmieri's remaining arguments regarding her *Monell* claim and her state law tort claims lack merit. Accordingly, we

---

[23]In reviewing Stockman's motion for summary judgment, the district court concluded that criminal probable cause supported the search warrant for Palmieri's residence. Because we conclude that administrative probable cause supported the administrative search warrant in the present case, we express no opinion as to whether criminal probable cause existed. But we affirm the district court because it reached the correct result, albeit under the wrong standard. *See Sengel v. IGT*, 116 Nev. 565, 570, 2 P.3d 258, 261 (2000) (explaining that an appellate court will affirm a district court's decision if the district court reached the correct result, but for the wrong reason.

affirm the district court's order granting summary judgment in its entirety.

_____, J.
Silver

I concur:

_____, C.J.
Gibbons

TAO, J., concurring:

Although based upon one of the shortest federal statutes on the books (or maybe because of it), civil rights claims under 42 U.S.C. § 1983 can be complex beasts, requiring courts to sort through a mixture of substantive criminal law, criminal procedure, and civil procedure, along with the doctrine of qualified immunity, which hangs over everything and requires examination before a court can even reach the merits of a claim. *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (question of whether qualified immunity bars § 1983 claim should normally be resolved early in the case).

In a case like this, the doctrine of qualified immunity implicates two related but different questions: whether the search was valid, and whether the executing officer reasonably believed that it was valid. If the answer to both of those inquiries is yes, then as a matter of law the officer's actions are protected by qualified immunity. If the answer to both of those inquiries is no, then as a matter of law the officer's actions are not. In some cases, the answers to those two questions may diverge: a search can be invalid, yet the searching officer may have reasonably believed it to be valid and may therefore nonetheless be immune from civil liability.

The majority concludes both that the warrant was valid and also that Officer Stockman reasonably believed it to be valid. I write separately because I believe that a more serious and unsettled question exists regarding the validity of the administrative warrant in this case than the majority acknowledges, and therefore this appeal just might fall into the third category of cases rather than the first. However, I concur

with the outcome of this appeal because, whether the warrant was valid or not, Judy Palmieri did not meet her burden of demonstrating that Officer Stockman acted unreasonably or recklessly enough to waive the shield of qualified immunity to which she is otherwise entitled as a law enforcement officer performing a discretionary function.

The first step that we must take to resolve this appeal is to identify the governing law. The majority analyzes the search warrant in this case primarily by relying upon federal caselaw, with a few state cases thrown in for good measure.[1]

At first blush, this seems to make some sense; Nevada generally follows federal law on most search-and-seizure questions. *State v. Lloyd*, 129 Nev. ___, ___, 312 P.3d 467, 471 (2013). Furthermore, as a general matter, it is axiomatic that federal law governs federal claims, even those filed in state courts; after all, that is what the Supremacy Clause says. U.S. Const. art. VI, cl. 2 ("[T]he Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."). 42 U.S.C. § 1983 is a

---

[1]For example, the majority discusses *Commonwealth v. DeLuca*, 6 Pa. D. & C. 5th 306, 324-25 (Pa. Ct. C.P., Del. Cnty. 2008). But Pennsylvania does not follow federal search-and-seizure law on many issues, choosing instead to implement its own version of the exclusionary rule. *Commonwealth v. Edmunds*, 586 A.2d 887, 896-99 (Pa. 1991) ("The history of Article I, Section 8 [of the Pennsylvania Constitution] thus indicates that the purpose underlying the exclusionary rule in this Commonwealth is quite distinct from the purpose underlying the exclusionary rule under the 4th Amendment . . . .").

(O) 1947B

federal statute, so federal law follows everywhere a § 1983 claim is filed; thus it is entirely unnecessary for us to "adopt" any of it to resolve a § 1983 action. *Howlett v. Rose*, 496 U.S. 356, 358, 375 (1990) ("State courts as well as federal courts have jurisdiction over § 1983 cases" but "the elements of, and the defenses to, a federal cause of action are defined by federal law"). Indeed, state courts cannot constitutionally refuse to apply federal law to § 1983 claims even when filed in a state court. *Id.* at 367-371 ("The Supremacy Clause makes [federal] laws 'the supreme Law of the Land,' and charges state courts with a coordinate responsibility to enforce that law . . . . The Supremacy Clause forbids state courts to dissociate themselves from federal law [in resolving § 1983 claims]."). *See Richard v. Bd. of Supervisors of La. State Univ.*, 960 So. 2d 953, 961 (La. Ct. App. 2007) ("[T]he same body of federal law governs § 1983 actions in state and federal courts . . . ."); *Walker v. Maruffi*, 737 P.2d 544, 547 (N.M. Ct. App. 1987) (in § 1983 actions, "[w]e are bound by decisions of the United States Supreme Court affecting federal law"); *United States ex rel. Lawrence v. Woods*, 432 F.2d 1072, 1075-76 (7th Cir. 1970), *cert. denied*, 402 U.S. 983 (1971) ("The Supreme Court of the United States has appellate jurisdiction over federal questions arising either in state or federal proceedings, and by reason of the supremacy clause the decisions of that court on national law have binding effect on all lower courts whether state or federal."). *See generally* Sheldon H. Nahmod, *Civil*

COURT OF APPEALS
OF
NEVADA

(O) 1947B

*Rights and Civil Liberties Litigation* § 4.03, at 275 (3d ed. 1991) (federal law governs § 1983 actions filed in state court).[2]

---

[2]The problem is that once we get below the level of greatest generality, the phrase "federal law" is less clear than it appears because federal cases are not always as monolithic, uniform, or even consistent as perhaps they should be. Frequently the real issue boils down to which competing version of federal law should be applied.

For example, when a search warrant affidavit contains a false statement, the warrant might still be valid if it would have issued anyway had the falsity not been included. *Golino v. City of New Haven*, 950 F.2d 864, 871 (2d Cir. 1991), *cert. denied*, 505 U.S. 1221 (1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). But in the context of § 1983, the federal circuits disagree on whether this question is answered by the court as a matter of law, or by the jury as a matter of fact. Some circuits hold that it is either a mixed question of fact and law, or a pure question of fact reserved for the jury. *See Velardi v. Walsh*, 40 F.3d 569, 574 (2d Cir. 1994); *see Hill v. McIntyre*, 884 F.2d 271, 275-76 (6th Cir. 1989). Other circuits, including the Ninth, have held that it is a question of law. *Hervey v. Estes*, 65 F.3d 784, 789 n.5 (9th Cir. 1995). Whether a question is characterized as one of fact or law quite obviously has a real bearing on whether, and when, a claim can or cannot be properly be resolved on summary judgment, as Palmieri's claim was below.

Here, the majority chooses to follow the Ninth Circuit's approach in *Hervey*. In isolation, I do not disagree with this; Ninth Circuit decisions are frequently considered to be persuasive, though not binding, authority by the Nevada Supreme Court. *See Blanton v. N. Las Vegas Mun. Court*, 103 Nev. 623, 633, 748 P.2d 494, 500 (1987), *aff'd sub nom. Blanton v. City of N. Las Vegas, Nev.*, 489 U.S. 538 (1989). But later in the opinion, the majority also chooses to follow the Eleventh Circuit's approach in *West Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 957-58 (11th Cir. 1982), on the standards for a proper "administrative search." But the Eleventh Circuit does not appear to fully agree with the Ninth Circuit on how the doctrine of qualified immunity in a § 1983 action should be evaluated on summary judgment. *See Branch v. Tunnell*, 937 F.2d 1382, 1385-86 (9th Cir. 1991), *disagreeing with Kenyatta v. Moore*, 744 F.2d 1179 (5th Cir. 1984) (the Eleventh Circuit was split off of the Fifth Circuit, and Fifth

*continued on next page...*

However, in this particular case it is not clear that the majority has applied the correct body of law because a state is free to "impose higher standards on searches and seizures than required by the Federal Constitution if it chooses to do so," *Cooper v. California*, 386 U.S. 58, 62 (1967), and Nevada may have done just that in connection with administrative searches in a case that the majority overlooks.

In *Owens v. City of North Las Vegas*, 85 Nev. 105, 450 P.2d 784 (1969), the Nevada Supreme Court appears to have imposed a requirement upon administrative search warrants that does not exist in some other jurisdictions: administrative warrants "should normally be sought only after the entry has been refused, absent some compelling reason for securing immediate entry."[3] *Id.* at 111, 450 P.2d at 788. The court noted:

---

*...continued*
Circuit precedent from that time frame is binding upon the Eleventh unless overruled or modified, *see Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc)). *See also United States v. Kapordelis*, 569 F.3d 1291, 1308 (11th Cir. 2009) ("This Court has not, however, stated a precise standard of review for a district court's denial of a *Franks* hearing[, and] we need not determine which standard of review applies today."). So, the majority seems to suggest that we follow the Eleventh Circuit's law when it comes to the substance of an administrative warrant, but we follow the law of the Ninth Circuit when it comes to whether we analyze certain aspects of that substance on summary judgment as questions of law or fact. I am not sure these are consistent, but I suppose any potential incongruity must be sorted out in future cases.

[3]As the majority notes in footnote 21, this language somewhat echoes language from the U.S. Supreme Court in *Camara v. Municipal Court*, 387 U.S. 523, 539-40 (1967). But notably, *Camara* stated that an administrative warrant could issue without a prior "refusal of entry" when the warrant was based upon a "citizen complaint" or there is "other

*continued on next page...*

COURT OF APPEALS
OF
NEVADA

(O) 1947B

Where considerations of health and safety are involved, the facts that would justify an inference of "probable cause" to make an inspection are different from those that would justify an inference when a criminal investigation has been undertaken. Experience may show the need for periodic inspections of certain facilities without a further showing of cause . . . that substandard conditions dangerous to the public are being maintained. The passage of a certain period without inspection might of itself be sufficient in a given situation to justify the issuance of a warrant. The test of "probable cause" required by the Fourth Amendment can take into account the nature of the search that is being sought. There can be no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails.

. . . We appreciate that in most routine inspections there is no great urgency to inspect at a certain time on a given day. Likewise, most citizens will permit routine inspections without a warrant. As a practical matter, in view of the Fourth Amendment's requirement that a warrant

---

*...continued*

satisfactory reason." The Nevada Supreme Court specifically omitted this language from *Owens*, instead only permitting an exception where there is a "compelling reason" for immediate entry regardless of whether the complaint came from a citizen or not, language that does not appear in *Camara* and is obviously much narrower. Therefore, I disagree that *Owens* only repeats and adds nothing to *Camara* when it plainly, and we must assume intentionally, uses entirely different language. Furthermore, *Owens* has been good law since 1969, and Respondent Clark County is well aware of it, at least at an institutional level, having cited it as authority in its Answering Brief in *Ransdell v. Clark County,* No. 48592, 2007 WL 6528461 (Nev. Aug. 16, 2007).

COURT OF APPEALS
OF
NEVADA

(O) 1947B

describe the property to be searched, warrants should normally be sought only after the entry has been refused, absent some compelling reason for securing immediate entry.

*Id.* at 110-11, 450 P.2d at 787-88. The court affirmed the validity of the administrative warrant in the case before it, observing that the warrant request "grew out of Owens' refusal to permit the city building inspector to enter his home to check for violations of the city building code." *Id.* at 106, 450 P.2d at 785.

In contrast, nothing like that happened before Palmieri's home was searched. Officer Stockman made no effort to seek consensual entry into Judy Palmieri's home at any time before seeking a warrant; according to Stockman's own affidavit, she merely received a phone tip, performed a computer search, and then submitted a warrant application for approval. From what I can tell, this all happened within a matter of minutes, and Officer Stockman never even bothered to visit the premises until she arrived later with the signed warrant already in hand. Therefore, entry was never requested or denied in this case before the warrant was sought or obtained.

Furthermore, I can see no "compelling" reason in this case to justify an immediate entry without such a request when the conditions of Palmieri's dogs were unlikely to have changed during the time it might have taken to procure a warrant after knocking on the door and asking for permission first. Unlike drugs or other small contraband, dogs cannot be flushed down the toilet or otherwise easily disposed of, and if it is true that they were dangerously unhealthy when Stockman first knocked, they likely would have been in the same condition shortly thereafter when she returned with a warrant.

(O) 1947B

Accordingly, the "refusal of entry" language of *Owens* has not been complied with in this case.[4] The difficult question is whether that alone renders the administrative warrant invalid; *Owens* does not quite say that an administrative warrant sought without a prior refusal of entry is *per se* invalid for that reason alone. Rather, *Owens* emphasizes that the touchstone for validity is the reasonableness of the warrant request under the circumstances. 85 Nev. at 107-08, 450 P.2d at 785-86.

Fundamentally, there are three ways to read the "refusal of entry" language contained in *Owens*: (1) as imposing an additional requirement above and beyond those already required by the Fourth Amendment that must be independently met in every case before an administrative warrant may issue in Nevada; (2) as merely identifying one consideration that a judge may take into account in determining whether a warrant request is reasonable or not (i.e., observing that warrant

---

[4]The closest the majority comes to applying the *Owens* test to the facts of this case is in its observation in footnote 3 that Palmieri previously denied entry to another animal control officer, Jason Elff, on another occasion. But that was in 2006, four years before the search in this case and in response to an entirely different complaint. The majority also notes in footnote 21 that Officer Stockman later testified in deposition that she believed requesting entry would be futile, but that assertion was not included within the search warrant affidavit. The validity of a search warrant must be assessed based only upon what the judge knew when the warrant was signed, not on facts hidden from the judge or uncovered after the warrant has already been obtained. *See Illinois v. Gates*, 462 U.S. 213, 236 (1983) (when assessing the validity of a search warrant affidavit, courts look only to the four corners of the affidavit itself to determine whether, based upon the affidavit alone, the magistrate had a "substantial basis" for authorizing the search at the time the request was made). Therefore, Officer Stockman's later deposition testimony simply cannot be considered in assessing whether the warrant was valid when issued.

requests made after entry has been refused are more likely to be deemed reasonable than ones in which this has not happened); or (3) as pure *obiter dicta* that adds nothing to the constitutional analysis.

If *Owens* is anything other than pure *dicta*, then as an intermediate court we must follow and apply it faithfully, even if it might seem incompatible with federal law or decisions from other states addressing the same issue.

> The principle of *stare decisis* is designed to promote stability and certainty in the law. While most often invoked to justify a court's refusal to reconsider its own decisions, it applies *a fortiori* to enjoin lower courts to follow the decision of a higher court. This principle is so firmly established in our jurisprudence that no lower court would deliberately refuse to follow the decision of a higher court. But cases come in all shapes and varieties, and it is not always clear whether a precedent applies to a situation in which some of the facts are different from those in the decided case. Here lower courts must necessarily make judgments as to how far beyond its particular facts the higher court precedent extends.

*Hubbard v. United States*, 514 U.S. 695, 720 (1995) (Rehnquist, J., dissenting).

If *Owens* is read to impose an additional and independent Nevada-specific requirement upon administrative warrants in order for them to be validly issued, that requirement was not met here and the warrant was invalid. If *Owens* is read to merely articulate one factor relating to "reasonableness" that the court must consider, that factor was not considered by the district court below and has not been considered by

COURT OF APPEALS
OF
NEVADA

(O) 1947B

the majority, and the warrant might or might not be valid. Either way, the question is considerably more complicated than it might first appear.

Were the constitutionality of Officer Stockman's administrative warrant the only question before us, then we would have to "make judgments as to how far beyond its particular facts the higher court precedent extends." *Hubbard*, 514 U.S. at 720. But the question before us is not the *per se* validity of the warrant, but rather whether Officer Stockman is entitled to qualified immunity from liability under § 1983. And, under the circumstances of this appeal, answering that question does not require us to definitively resolve how *Owens* must be interpreted. Indeed, and perhaps somewhat ironically, what is important for purposes of resolving Officer Stockman's qualified immunity defense is the very lack of clarity in *Owens*.

In certain circumstances, a law enforcement officer can conduct a defective search and yet still be cloaked with qualified immunity from subsequent civil liability. A searching officer is entitled to qualified immunity if "a reasonable officer could have believed" that the search was lawful "in light of clearly established law and the information the searching officers possessed." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). The central question is whether someone in the officer's position could reasonably but mistakenly conclude that his conduct complied with the Fourth Amendment. *Id.*; *see also Saucier v. Katz*, 533 U.S. 194, 206 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). This is the same objective reasonableness standard applied under the "good faith" exception to the exclusionary rule. *See Malley v. Briggs*, 475 U.S. 335, 344 (1986);

COURT OF APPEALS
OF
NEVADA

(O) 1947B

*see also Groh v. Ramirez*, 540 U.S. 551, 566 (2004) (Kennedy, J., dissenting).

Law enforcement officers lose their immunity if it is "obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley*, 475 U.S. at 341; *see Velardi v. Walsh*, 40 F.3d 569, 575-76 (2d Cir. 1994) ("Whether or not the Fourth Amendment's particularity requirement would have been satisfied on these facts in the context of a motion to suppress . . . we conclude that the defendants' qualified immunity shields them from liability [when] it was objectively reasonable for them to believe that their actions did not violate Fourth Amendment requirements." (citation omitted)).

Generally speaking, there are several types of mistakes that a law enforcement official may make. The officer may make a mistake of law, i.e., be unaware of existing law and how it should be applied. *See Saucier*, 533 U.S. at 206. Alternatively, the officer may make a mistake of fact, i.e., may misunderstand important facts about the search and assess the legality of his conduct based on that misunderstanding. *See, e.g., Arizona v. Evans*, 514 U.S. 1 (1995). Or, the officer may misunderstand elements of both the facts and the law. *See Creighton*, 483 U.S. at 641. Qualified immunity jurisprudence applies regardless of whether the officer's error was a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact. *Butz v. Economou*, 438 U.S. 478, 507 (1978) (noting that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law"). Whatever kind of mistake is involved, the ultimate question is whether the officer's reliance upon the defect was reasonable.

What we have in this case is a possible mistake of law; entry into Palmieri's home was not refused pursuant to *Owens* before the warrant was sought. But if a mistake occurred, it was not a violation of "clearly established" law that should have been "obvious" to Officer Stockman. As I have observed, *Owens* can be read in alternative ways, one of which would invalidate the warrant and two of which might or might not. Therefore, it cannot be said to have represented law so established that every reasonable law enforcement officer should have familiarized themselves with its contours before being put into the field with the power to apply for administrative warrants. For that reason, I agree that Officer Stockman cannot be said to have acted unreasonably under the totality of the circumstances, and she has not forfeited the shield of qualified immunity.[5]

---

[5]Furthermore, a defective search may still be considered valid so long as the executing officer relied in objective "good faith" upon the authority of the search warrant. *See United States v. Leon*, 468 U.S. 897, 920-21 (1984); *Byars v. State*, 130 Nev. ___, ___, 336 P.3d 939, 947 (2014) (following *Leon*). Here, Officer Stockman submitted her search warrant application to her supervisor, to the career prosecutors at the Clark County District Attorney's Office, and finally to a district court judge, all of whom approved the application notwithstanding its possible flaws. Considering the vagueness of *Owens*, Officer Stockman acted reasonably when she went through proper channels and sought, and received, approval for her actions at every level from others in whom she was entitled to place her trust. Under the circumstances of this case, the district judge reviewed and signed the warrant, and there is no evidence that Officer Stockman acted in a nefarious or underhanded way or had any reason to doubt that the warrant was entirely valid once the ink on the judge's signature was dry.

COURT OF APPEALS
OF
NEVADA

(O) 1947B

Therefore, I agree with the majority's thorough and detailed analysis of this appeal. Under the facts of this case, the meaning of *Owens* is not central to our disposition and will have to be addressed another day.

_____, J.
Tao

COURT OF APPEALS
OF
NEVADA

(O) 1947B